# United States Court of Appeals for the Federal Circuit

---

**BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S., BORUSAN MANNESMANN PIPE U.S. INC.,**
*Plaintiffs-Appellants*

**v.**

**UNITED STATES, WHEATLAND TUBE, NUCOR TUBULAR PRODUCTS INC.,**
*Defendants-Appellees*

---

2021-2097

---

Appeal from the United States Court of International Trade in No. 1:20-cv-00015-JAR, Senior Judge Jane A. Restani.

---

Decided:  March 15, 2023

---

JULIE MENDOZA, Morris, Manning & Martin, LLP, Washington, DC, argued for plaintiffs-appellants. Also represented by DONALD CAMERON, JR., MARY HODGINS, BRADY MILLS, R. WILL PLANERT, EDWARD JOHN THOMAS, III; TIMOTHY MEYER, Duke University School of Law, Durham, NC.

ALAN H. PRICE, Wiley Rein, LLP, Washington, DC, for defendant-appellee Nucor Tubular Products Inc.  Also

represented by THEODORE PAUL BRACKEMYRE, ROBERT E. DEFRANCESCO, III, PAUL A. DEVAMITHRAN.

ELIZABETH DRAKE, Schagrin Associates, Washington, DC, argued for defendant-appellee Wheatland Tube. Also represented by NICHOLAS J. BIRCH, CHRISTOPHER CLOUTIER, WILLIAM ALFRED FENNELL, LUKE A. MEISNER, KELSEY RULE, ROGER BRIAN SCHAGRIN.

ROBERT R. KIEPURA, Commercial Litigation Branch, Civil Division, United States Department of Justice, Washington, DC, argued for defendant-appellee United States. Also represented by BRIAN M. BOYNTON, PATRICIA M. MCCARTHY, FRANKLIN E. WHITE, JR.; RACHEL BOGDAN, Office of the Chief Counsel for Trade Enforcement and Compliance, United States Department of Commerce, Washington, DC.

_____

Before TARANTO, STOLL, and CUNNINGHAM, *Circuit Judges*.

TARANTO, *Circuit Judge*.

From May 2017 to April 2018, Borusan Mannesmann Boru Sanayi ve Ticaret A.S. and Borusan Mannesmann Pipe U.S. Inc. (collectively, Borusan) imported circular welded carbon steel pipes and tubes (carbon steel pipe) that were subject to decades-old antidumping duties. Near the end of that period in 2018, the President issued Proclamation 9705, which separately imposed a duty on imported steel articles (including Borusan's carbon steel pipe) under § 232 of the Trade Expansion Act of 1962, 19 U.S.C. § 1862. In the annual administrative review of the antidumping duties owed on Borusan's imports for the May 2017–April 2018 period, the Department of Commerce treated the Proclamation 9705 duty as a "United States import dut[y]" under 19 U.S.C. § 1677a(c)(2)(A), a treatment that resulted in higher antidumping duties for Borusan's imports in the

review than if Commerce had not so treated the Proclamation 9705 duty.

Borusan challenged Commerce's annual-review determination in the Court of International Trade (Trade Court), urging that the phrase "United States import duties" in § 1677a(c)(2)(A) did not encompass any duties imposed under § 232. The Trade Court disagreed and affirmed Commerce's treatment of the Proclamation 9705 duty. *Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States*, 494 F. Supp. 3d 1365, 1371–76 (Ct. Int'l Trade 2021). That ruling is now here on Borusan's appeal. Because Commerce correctly determined that the particular § 232 duty imposed by Proclamation 9705 is a "United States import dut[y]" under 19 U.S.C. § 1677a(c)(2)(A), we affirm.

I

A

Antidumping duties are designed to remedy injury or threatened injury to domestic industry from the importation of merchandise sold in the United States at a price less than the merchandise's fair value (*i.e.*, dumping). *See* 19 U.S.C. § 1673; *Thyssenkrupp Steel North America, Inc. v. United States*, 886 F.3d 1215, 1217 (Fed. Cir. 2018). The antidumping duty is set to equal the amount by which the imported merchandise is sold below its fair value. 19 U.S.C. § 1673. Importers make appropriate deposits upon entering merchandise subject to an antidumping duty, but final determinations of the duties owed are generally made in annual administrative reviews (if requested) that cover imports during the preceding 12 months (the period of review). *Id.* § 1675(a)(1); *see Thyssenkrupp*, 886 F.3d at 1218 (describing this "retrospective" system).

Of importance to the present appeal, antidumping duties depend on the "dumping margin," 19 U.S.C. § 1677(35)(A), which is the difference between "the normal

value" and the "export price (or the constructed export price) for the merchandise," *id.* § 1673. The normal value, *i.e.*, the value in the home country, is commonly the price at which the merchandise is sold in the exporting country, subject to certain adjustments. *Id.* § 1677b(a)(1)(B). On the other hand, the "export price" is

> the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted under subsection (c).

*Id.* § 1677a(a). A "constructed export price" is similar for present purposes.[1] In either case, this price, before it is adjusted as next described, can be called the "U.S. price." *See United States Steel Corp. v. United States*, 621 F.3d 1351, 1353 & n.1 (Fed. Cir. 2010) (defining "export price" as "the price of the product in the United States").

---

[1]   A "constructed export price," also involving a foreign producer's or exporter's first sale to an unaffiliated purchaser, is used when the location of such a sale is "in the United States"—rather than (as with an "export price") "outside of the United States"—according to the definition of "construction export price" as

> the price at which the subject merchandise is first sold (or agreed to be sold) in the United States before or after the date of importation by or for the account of the producer or exporter of such merchandise or by a seller affiliated with the producer or exporter, to a purchaser not affiliated with the producer or exporter, as adjusted under subsections (c) and (d).

19 U.S.C. § 1677a(b).

To arrive at the final export or constructed export price, adjustments must be made. For example, the U.S. price must be "increased by . . . the amount of any countervailing duty imposed on the subject merchandise under part I of this subtitle [19 U.S.C. §§ 1671–1671h] to offset an export subsidy." 19 U.S.C. § 1677a(c)(1)(C). And, what is key here, the U.S. price also must be "reduced by[,] . . . except as provided in paragraph (1)(C)," *i.e.*, except for certain countervailing duties,

> the amount, if any, included in such price, attributable to any additional costs, charges, or expenses, and *United States import duties*, which are incident to bringing the subject merchandise from the original place of shipment in the exporting country to the place of delivery in the United States.

*Id.* § 1677a(c)(2)(A) (emphasis added). We have described these adjustments as designed to produce an "apples with apples" comparison between the price at which the merchandise is sold in the U.S. and the price at which it is sold in the home country. *Smith-Corona Group v. United States*, 713 F.2d 1568, 1578 (Fed. Cir. 1983); *see also APEX Exports v. United States*, 777 F.3d 1373, 1375 (Fed. Cir. 2015).

B

Borusan Mannesmann Boru Sanayi ve Ticaret A.S. produces carbon steel pipe in Turkey and exports it to the United States. Borusan Mannesmann Pipe U.S. Inc., a United States-based affiliate of Borusan A.S., imports carbon steel pipe into the United States. Borusan's carbon steel pipe has long been subject to antidumping duties, *see, e.g.*, *Antidumping Duty Order: Welded Carbon Steel Standard Pipe and Tube Products from Turkey*, 51 Fed. Reg. 17,784 (May 15, 1986), including the Borusan pipe imported from May 2017 through April 2018.

In March 2018, the President issued a proclamation, pursuant to § 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877, codified as amended at 19 U.S.C. § 1862, that imposed a 25 percent ad valorem tariff on imported steel articles, including carbon steel pipe, from all countries except Canada and Mexico, entered (or withdrawn from a warehouse for consumption) on or after March 23, 2018. Proclamation 9705, 83 Fed. Reg. 11,625 (Mar. 15, 2018). The proclamation directed that the duty was to be imposed "in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles." *Id.* clause 2, 83 Fed. Reg. at 11,627. Although the President later modified Proclamation 9705, the 25 percent duty applied to Borusan's imports for the last five weeks or so of the period from May 1, 2017, through April 30, 2018, which was the period of review for the annual administrative review of antidumping duties initiated by Commerce in July 2018. *Initiation of Antidumping and Countervailing Duty Administrative Reviews*, 83 Fed. Reg. 32,270 (July 12, 2018).

In its final results for that administrative review, Commerce treated the Proclamation 9705 duty as a "United States import dut[y]" under 19 U.S.C. § 1677a(c)(2)(A). Because Borusan had built this duty into its U.S. price (raising, after imposition of the Proclamation 9705 duty, what the U.S. price was before the duty), Commerce subtracted the Proclamation 9705 duty from the Borusan U.S. price, thereby lowering the export (and constructed export) price for Borusan (from what it would be without subtraction) and enlarging the gap between the normal value and the export (and constructed export) price, *i.e.*, increasing the dumping margin that determines the antidumping duty owed. *Circular Welded Carbon Steel Standard Pipe and Tube Products from Turkey: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017–2018*, 85 Fed. Reg. 3616 (Jan. 22, 2020) (*Final Results*); *see also Circular Welded Carbon*

*Steel Standard Pipe and Tube Products from Turkey: Amended Final Results of Antidumping Duty Administrative Review; 2017–2018*, 85 Fed. Reg. 12,893 (Mar. 5, 2020); J.A. 1348.

In a memorandum issued with the *Final Results*, J.A. 2368, Commerce analyzed two factors to determine whether the Proclamation 9705 duty, imposed under § 232, is a "regular" duty, such that, according to Commerce, it falls within the meaning of "United States import duties," or a "special duty," such that it does not. J.A. 2397–400. Commerce borrowed the distinction, and factors used to apply it, from its determination made years earlier in considering a different presidential proclamation, Proclamation 7529, 67 Fed. Reg. 10,553 (Mar. 7, 2002), that imposed so-called "safeguard" (or "§ 201") duties under different statutory authority, namely, § 201 *et. seq.* of the Trade Act of 1974, Pub. L. No. 93-618, title II, §§ 201–05, 88 Stat. 1978, 2011–18 (codified as amended at 19 U.S.C. §§ 2251–55). *See Stainless Steel Wire Rod from the Republic of Korea: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 19,153 (Apr. 12, 2004) (*SWR Korea*); *Wheatland Tube Co. v. United States*, 495 F.3d 1355, 1359–66 (Fed. Cir. 2007) (affirming the *SWR Korea* analysis under *Chevron U.S.A., Inc. v. Natural Resources Defense Council*, 467 U.S. 837 (1984)). Specifically, Commerce analyzed (1) whether the Proclamation 9705 duty is remedial and (2) whether "double counting" of the duty would result from deeming it a United States import duty and therefore subtracting it from the U.S. price. J.A. 2397–400. Commerce did not analyze a third factor identified in the earlier § 201 proceedings: whether the duty at issue is temporary.

Commerce determined that Proclamation 9705's duty is not remedial, making it unlike special duties, because duties imposed under § 232 "are not focused on remedying injury to a domestic industry" but instead on eliminating threats to national security. J.A. 2398. Commerce also concluded that "antidumping duties and section 232

duties" serve "separate and distinct" functions, so "there would be no overlap between the two in providing the remedies sought by each," and hence no double counting in deeming the duty imposed under § 232 a United States import duty to be subtracted under 19 U.S.C. § 1677a(c)(2)(A). J.A. 2399. Commerce then pointed to Proclamation 9705's statement, which it described as "critical" to its double-counting analysis, that the duty is "to be imposed in addition to other duties." J.A. 2400. Finally, Commerce concluded that the International Trade Commission's placement of the § 232 duty at issue in the "special" duties chapter of the Harmonized Tariff Schedule is not sufficient to change the above-described conclusion. *Id.* Because Commerce determined in a separate memorandum that the Proclamation 9705 duty was in fact included in the U.S. price for Borusan before adjustment, J.A. 1348, it subtracted the duty under 19 U.S.C. § 1677a(c)(2)(A).

Borusan challenged the *Final Results* in the Trade Court. It contended, among other things, that all duties imposed under § 232, categorically, must be deemed not "United States import duties." Wheatland Tube and Nucor Tubular Products, Inc., U.S. domestic producers of carbon steel pipe and therefore interested parties, 19 U.S.C. § 1677(9)(C), intervened.

The Trade Court, in its February 17, 2021 opinion, agreed with Commerce on the point now at issue here. *Borusan*, 494 F. Supp. 3d at 1373–76. It determined that duties imposed by the President under § 232 are "remedial in a broad sense" but are unlike the presidentially imposed safeguard duties (also called "§ 201 duties") that were at issue in *SWR Korea* and *Wheatland*. *Id.* at 1374. Safeguard duties, the Trade Court said, "require[] a finding of a particular level of injury or threat of injury," whereas duties imposed under § 232 "could be used to promote vital nascent industries, not just already established injured industries," in which case "remediation would not be a primary goal." *Id.* The Trade Court further noted that duties

imposed under § 232 are not subject to statutory time limits, unlike safeguard duties, which are subject to such time limits, *see* 19 U.S.C. § 2253(e), but nevertheless determined that duties imposed under section 232 are "not . . . significantly more permanent than safeguard duties." *Borusan*, 494 F. Supp. 3d. at 1374–75. The Trade Court gave a third factor—whether inclusion in "United States import duties" results in double counting—the greatest weight. *Id.* at 1375–76. It explained that "[t]here is a clear statutory interplay between Section 201 duties and antidumping duties," which is not the case for duties imposed under § 232, so no double counting results from treating the latter as "United States import duties" under 19 U.S.C. § 1677a(c)(2)(A) to calculate the dumping margin. *Id.* at 1375. The Trade Court finally noted that the parties accepted that Borusan's relevant U.S. prices included the Proclamation 9705 duty. *Id.* at 1376 n.9.

The Trade Court remanded the matter for Commerce to consider other issues immaterial to the present appeal. *Id.* at 1377. Commerce issued final results of redetermination on April 19, 2021. The Trade Court, "[h]aving received no objections to . . . the Remand Results," entered final judgment "sustain[ing]" them and ordering "liquidat[ion] [of the Borusan entries covered by the administrative review] in accordance with the final court decision in this action, including all appeals." J.A. 1 (capitalization removed). Borusan timely appealed.[2] We have jurisdiction under 28 U.S.C. § 1295(a)(5).

II

"We review the Commerce decisions at issue de novo, using the same standard of review applied by the [Trade Court] . . . ." *Quiedan Co. v. United States*, 927 F.3d 1328,

---

[2]    Wheatland and the United States each cross-appealed, but those cross-appeals have been dismissed.

10    BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S. v. US

1330 (Fed. Cir. 2019) (citations omitted). We must sustain Commerce's determinations in antidumping duty proceedings unless they are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i). "For factual determinations, substantial evidence is 'such relevant evidence as a reasonable mind might accept to support a conclusion' considering the record as a whole." *Mid Continent Steel & Wire, Inc. v. United States*, 941 F.3d 530, 537 (Fed. Cir. 2019) (citations omitted). We evaluate questions of statutory interpretation de novo. *Transpacific Steel LLC v. United States*, 4 F.4th 1306, 1318 (Fed. Cir. 2021).

There is no properly preserved dispute before us about Commerce's determination, J.A. 1348, that the duty imposed by Proclamation 9705 was in fact included in Borusan's U.S. prices.[3] The only issue is whether it was permissible for Commerce to treat that duty as a "United States import dut[y]" under 19 U.S.C. § 1677a(c)(2)(A) to be subtracted from those U.S. prices to arrive at the export (and constructed export) price used for calculation of the dumping margin. We draw the proclamation-specific conclusion that this treatment was permissible.

A

Before addressing the situation presented here—a specific presidential proclamation imposing a duty under

---

[3]    Borusan did not challenge that determination before the Trade Court. *See Borusan*, 494 F. Supp. 3d at 1376 n.9. Nor did Borusan challenge the determination in this court until its reply brief, Reply Br. at 25-27, which was too late. *See In re Google Technology Holdings LLC*, 980 F.3d 858, 863 (Fed. Cir. 2020); *Aventis Pharma S.A. v. Hospira, Inc.*, 675 F.3d 1324, 1332 (Fed. Cir. 2012).

§ 232—we recount the decisions of Commerce and of this court that addressed the application of 19 U.S.C. § 1677a(c)(2)(A) to safeguard duties imposed by a 2002 presidential proclamation under the distinct § 201 regime. Those decisions feature prominently in the Commerce decision, Trade Court ruling, and parties' briefing before us.

Section 201 authorizes the President to take actions when an "article is being imported into the United States in such *increased* quantities as to be a substantial cause of serious injury, or the threat thereof, to . . . domestic industry." 19 U.S.C. § 2251(a) (emphasis added to indicate why § 201 is commonly described as addressing surges in imports). Among the wide range of actions authorized is "an increase in, or the imposition of, any duty on the imported article." *Id.* § 2253(a)(3)(A). For purposes of the chapter containing § 201 *et seq.*, "[t]he term 'duty' includes the rate and form of any import duty, including but not limited to tariff-rate quotas." *Id.* § 2481(1). Congress set certain prerequisites to presidential action, including an identified determination by the International Trade Commission about injury or threatened injury. *Id.* §§ 2251–54. Presidentially proclaimed measures are time-limited, presumptively to four years. *Id.* § 2253(e).

In 2002, the President issued Proclamation 7529 to impose duties under § 201 on merchandise that was also subject to antidumping duties, *e.g.*, stainless steel wire rod from the Republic of Korea, *SWR Korea*, 69 Fed. Reg. at 19,153, and carbon steel pipe from Thailand, *Certain Welded Carbon Steel Pipes and Tubes from Thailand: Final Results of Antidumping Duty Administrative Review*, 69 Fed. Reg. 61,649 (Oct. 20, 2004). Commerce, in its annual administrative reviews addressing those antidumping duties, had to decide whether the Proclamation 7529 duties were "United States import duties." It concluded that they were not, after giving notice and receiving comments on the issue. *SWR Korea*, 69 Fed. Reg. at 19,154–61.

Commerce reasoned that there is a distinction between "special" duties and "regular" duties, that it had long excluded antidumping duties from "United States import duties," and that antidumping duties are "special duties." *Id.* at 19,159 (discussing the Antidumping Act of 1921, Pub. L. No. 67-10, title II, §§ 202, 211, 42 Stat. 9, 11–12, 15). Commerce then considered whether the duties at issue, imposed under § 201 by Proclamation 7529, were more like special duties, which include at least antidumping duties, or regular duties. *Id.* Much of Commerce's reasoning addressed § 201 generally, but some was specific to Proclamation 7529. *Id.* at 19,160.

Commerce stated that § 201 duties are both remedial and temporary, unlike normal duties. *Id.* at 19,159. Commerce also determined that treating the duties at issue as "United States import duties" presented problems of double counting similar to the circularity problems presented by treating antidumping duties as "United States import duties." *Id.* at 19,160. Commerce stated that duties imposed under § 201 and antidumping duties can be interrelated and remedy overlapping harms. *Id.*[4] Commerce then

---

[4]    For support, Commerce relied on a Senate Committee Report related to the Trade Act of 1974 (which enacted the § 201 regime), S. Rep. No. 93-1298 at 123 (1974), and also the Statement of Administrative Action (SAA) accompanying the Uruguay Round Agreements Act (URAA), the latter stating that, in considering the imposition of measures under § 201, "the President will continue the practice of taking into account relief provided under other provisions of law, such as the antidumping and countervailing duty laws," SAA, H.R. Doc. No. 103-316, Vol. 1, at 964 (1994). The SAA "shall be regarded as an authoritative expression by the United States concerning the interpretation and application of the Uruguay Round Agreements" and the URAA. 19 U.S.C. § 3512(d).

made the proclamation-specific point that there was "absolutely no indication in [Proclamation 7529] placing 201 duties on certain imports of steel that the President believed that Commerce effectively would increase those duties by taking them into account in calculating subsequent dumping margins." *Id.* Commerce reasoned that "any adjustment for the potential overlap between 201 and [antidumping] remedies is to be made by the President in setting the level of the 201 duties," and "[o]nce the President has struck this balance, it is not Commerce's place to upset that balance." *Id.*

In *Wheatland*, we approved Commerce's *SWR Korea* conclusion, affirming its application in the annual administration review before us. 495 F.3d at 1359–66. We quickly found ambiguity at step one of the *Chevron* framework. *Id.* at 1359–60. We explained that "Congress has not defined or explained the meaning or scope of 'United States import duties,'" *id.* at 1359, and concluded that "Congress has not 'directly spoken to the precise question at issue'"—"whether § 201 safeguard duties are to be considered 'United States import duties' for purposes of determining the [export price] and calculating dumping margin," *id.* at 1359–60.

We then determined, at step two of the *Chevron* framework, that Commerce's answer to this precise question was reasonable. Among other things, we specifically highlighted the lack of express presidential intent "regarding the calculation of antidumping margin" in the particular proclamation at issue. *Id.* at 1364. We quoted and relied on Commerce's explanation that the relationship between a particular safeguard duty and antidumping remedies was for the President to decide in imposing the former and that, in Proclamation 7529, "the balance between § 201 safeguard duties and antidumping duties had been set by the President." *Id.* at 1365. We also noted certain proclamation-specific facts as supporting Commerce's conclusion. *Id.* at 1364–65 (stating that only four of the twenty

14    BORUSAN MANNESMANN BORU SANAYI VE TICARET A.S. v. US

exporting countries were subject to both antidumping duties and § 201 safeguard duties).

Notably, the government emphasized proclamation-specific issues in its brief before us in *Wheatland*. For example, the government suggested that Commerce was in the best position to determine whether to deduct the § 201 duties at issue from the U.S. price because Commerce, through the Secretary of Commerce, is subject to the President's control. *Wheatland*, Nos. 2006-1524, -1525, United States Opening Br. at 41–42. The government also emphasized the lack of country-specific rates in Proclamation 7529, which it viewed as indicating that the President did not intend for the proclamation's duties to be imposed in addition to antidumping duties. *Id.* at 42–45.

B

1

The reference to "United States import duties" in § 1677a(c)(2)(A) is a reference to actually prescribed duties—not to a mere legal authorization to prescribe duties, such as the constitutional grant of power to Congress or a statutory grant of authority to the President. The provision requires "reducing" a concrete numerical price, the U.S. price, by "United States import duties," to the extent those duties are "included in such price" to arrive at a different concrete numerical price, the "export price" (or "constructed export price"). 19 U.S.C. § 1677a(c)(2)(A). There is nothing to subtract until a duty is prescribed. If a statute merely authorizes a governmental officer or body to impose a duty, as § 232 authorizes the President to do, it is the particular exercise of the authority that determines—based on the character of that exercise—whether the prescribed duty comes within § 1677a(c)(2)(A).

Nothing in § 1677a(c)(2)(A) requires the uniform treatment of all duties prescribed under a particular statutory authorization. Nor, more specifically, have we been shown

anything in the § 232 framework that requires the uniform treatment of all duties imposed by the President under § 232. Specifically, although Borusan suggests that we categorically conclude that § 232 duties are not United States import duties, *see* Oral Arg. at 43:20–44:19, it has presented no persuasive reason to conclude that the relevant question—whether a specific duty prescribed by a particular presidential action under § 232 constitutes a "United States import dut[y]" under § 1677a(c)(2)(A)—must have the same answer for all such actions under § 232.

Section 232 by its terms gives the President discretion to determine "the nature and duration of the action" needed to "adjust the imports of the article and its derivatives" to address the national-security threat. 19 U.S.C. § 1862(c)(1)(A)(ii). Even as to a choice between quotas and duties, § 232 gives the President "discretion in determining the method to be used to adjust imports." *Federal Energy Administration v. Algonquin SNG, Inc.*, 426 U.S. 548, 561 (1976). The President's discretion is broad enough to encompass the choice of whether a duty is to be imposed on top of the amounts of antidumping duties that would be due without the duty or, instead, is to partly or wholly substitute for such duties. *See Transpacific*, 4 F.4th at 1324–26 (affirming discretion as to action to be taken).

Thus, we need not make a statute-wide categorical determination regarding all duties imposed on imports by presidential action under § 232. We will focus on the character of Proclamation 9705 specifically—the authorized governmental action that actually prescribed the duty on imports at issue. This proclamation-specific approach is consistent with our decision in the § 201 setting in *Wheatland*, where, as described above, our approval of Commerce's determination relied in part on specifics of the particular proclamation at issue there and on Commerce's own declaration that it is for the President, in the duty-creating action under the § 201 regime, to determine the duty's relationship to antidumping duties. At oral

argument before this court, we note, government counsel seemingly agreed that *Wheatland* is "fair[ly] read[]" as "approving only the proclamation-specific determination by Commerce there, not a necessarily categorical treatment of all [§ 201] impositions." Oral Arg. at 29:28–30:09.

2

Proclamation 9705 makes clear that the duty newly being imposed was to add to, and not partly or wholly offset, the antidumping duties that would be due without the new duty. Proclamation 9705 provides:

> Except as otherwise provided in this proclamation, or in notices published pursuant to clause 3 of this proclamation, all steel articles imports specified in the Annex shall be subject to an additional 25 percent ad valorem rate of duty with respect to goods entered, or withdrawn from warehouse for consumption, on or after 12:01 a.m. eastern daylight time on March 23, 2018. This rate of duty, which is *in addition to any other duties*, fees, exactions, and charges applicable to such imported steel articles, shall apply to imports of steel articles from all countries except Canada and Mexico.

Proclamation 9705, clause 2, 83 Fed. Reg. at 11,627 (emphasis added). The proclamation imposes a duty on imports to the United States, which comes within the literal language, "United States import duties," of § 1677a(c)(2)(A). More particularly, the proclamation declares that the rate of duty is to be imposed "in addition to any other duties." *Id.*; *see also id.* at 11,629, Annex ("All anti-dumping, countervailing, or other duties and charges applicable to such goods shall continue to be imposed."). The context confirms the evident meaning of this declaration—that the duty should be charged on top of otherwise-determined antidumping duties. The President determined that national security was threatened by the unsustainably low utilization of domestic steel-producing

capacity, an underutilization tied to imports of steel, *id.* ¶¶ 5, 8, 11, 83 Fed. Reg. at 11,626–27, notwithstanding that antidumping duties had been in place for three decades on certain imports covered by the proclamation's duty.

We conclude that the only fair reading of Proclamation 9705 is that, when applied to an article covered by antidumping duties, the Proclamation 9705 and antidumping duties must together result in a full imposition of both duties. Producing that result requires the antidumping duty to be calculated as if the Proclamation 9705 duty did not exist—*i.e.*, by subtraction of the Proclamation 9705 duty from the U.S. price if the Proclamation 9705 duty is built into it. Otherwise, the Proclamation 9705 duty would be offset substantially or completely by a reduction in the antidumping duty itself (through an increase in the U.S. price and therefore a decrease in the dumping margin), defeating the evident "in addition to" prescription of Proclamation 9705. *See* J.A. 2400.

3

This treatment of the duty imposed in Proclamation 9705 is not inconsistent with Commerce's long-recognized categorical exclusion of antidumping duties themselves from classification as "United States import duties." Antidumping duties cannot be subtracted in the calculation of dumping margins (and hence antidumping duties), because doing so would produce a spiraling circularity. *See APEX Exports*, 777 F.3d at 1379 & n.2. It is therefore a necessary implication of the antidumping duty statute itself that such duties cannot come within § 1677a(c)(2)(A). *See United States v. Brown*, 333 U.S. 18, 27 (1948) ("No rule of construction necessitates our acceptance of an interpretation resulting in patently absurd consequences."). There is no such circularity problem with recognizing that the Proclamation 9705 duty on imports is a "United States import dut[y]."

Commerce similarly treats countervailing duties as categorically excluded from "United States import duties." *AK Steel Corp. v. United States*, 988 F. Supp. 594, 607–08 (Ct. Int'l Trade 1997). But there is no immediately evident circularity problem, and we have not addressed whether such treatment is proper. Commerce's practice in this regard thus does not undermine the conclusion here.

Commerce's determination in *SWR Korea*, involving a proclamation that imposed duties under § 201, and our decision in *Wheatland* upholding Commerce's decision, also do not preclude our view or Commerce's decision here. Commerce did use some categorical language in *SWR Korea*. 69 Fed. Reg. at 19,161 ("In conclusion, Commerce will not deduct 201 duties from U.S. prices in calculating dumping margins because 201 duties are not 'United States import duties' within the meaning of the statute."). But, importantly, its rationale for excluding the proclamation's duties from "United States import duties" depended expressly on the language and nature of the particular proclamation at issue, Proclamation 7529. *Id.* at 19,160 (noting that "any adjustment for the potential overlap between 201 and AD remedies is to be made by the President in setting the level of the 201 duties" and that Commerce cannot "upset that balance" "[o]nce the President has struck" it); *id.* (highlighting that there was "absolutely no indication in [Proclamation 7529] placing 201 duties on certain imports of steel that the President believed that Commerce effectively would increase those duties by taking them into account in calculating subsequent dumping margins"). Before this court, moreover, the government took pains to argue that Commerce's decision was perfectly consistent with Proclamation 7529. *Wheatland*, Nos. 2006-1524, -1525, United States Opening Br. at 41–42 (arguing that the "trial court made the further implausible assumption that Commerce, a Department of the Executive Branch, flouted the President's intent"). We likewise relied on Commerce's proclamation-specific reasoning,

*Wheatland*, 495 F.3d at 1365, and other aspects of Proclamation 7529, *id.* at 1364 (discussing the President's "intent regarding the calculation of antidumping margin at the time [he] imposed § 201 safeguard duties"); *id.* at 1364–65 (discussing the particular "§ 201 safeguard duties" imposed in Proclamation 7529).

In these circumstances, the present matter is properly distinguished from the relied-on § 201 decisions at least because of the difference in the presidential proclamations at issue. As discussed above, Proclamation 9705 requires that its duty be treated as a "United States import dut[y]" to be subtracted under § 1677a(c)(2)(A). In contrast, there was no comparable language in Proclamation 7529, and in light of a background recognition concerning potential overlap of § 201 duties and antidumping duties, Commerce found no implication that the Proclamation 7529 duties imposed should be subtracted so that they would add to, and not be substantially or completely offset by, reductions in the antidumping duties. In the present matter, as in the earlier one, the duty's treatment under § 1677a(c)(2)(A) is effectively determined by the President in exercising the broad power to shape the particular duty imposition, as Commerce suggested it should be, in a passage in *SWR Korea* that we quoted in *Wheatland*.

C

The foregoing analysis is enough for us to uphold Commerce's decision here. We do not decide whether the same result could soundly rest on distinctions between § 232 and the § 201 regime more generally, and the distinction between "normal" and "special" duties, articulated by Commerce and approved by the Trade Court here. That approach presents challenges that we may avoid. The Commerce decision sufficiently rests on the proclamation-specific basis set forth above. *See* J.A. 2399–400.

We also do not decide whether our *Wheatland* conclusion about ambiguity at *Chevron*'s step one is subject to

question based on intervening developments about, at least, the fullness of the statutory analysis required at that step. *See*, *e.g.*, *SAS Institute, Inc. v. Iancu*, 138 S. Ct. 1348, 1358 (2018) (stating that "whether *Chevron* should remain is a question we may leave for another day" and concluding that *Chevron* did not apply because "after applying traditional tools of interpretation here," the Court was "left with no uncertainty that could warrant deference"); *Kisor v. Wilkie*, 139 S. Ct. 2400, 2414–15 (2019) (in case concerning *Auer* deference regarding interpretation of a regulation, citing *Chevron* to clarify the *Auer* standard as permitting deference to an agency interpretation only if "after exhausting all the 'traditional tools' of construction, the regulation is genuinely ambiguous" (citation omitted)). The best interpretation of the statute, as relevant in this case, supports Commerce's decision, making it unnecessary to apply the *Chevron* framework. *See Nicely v. United States*, 23 F.4th 1364, 1368 (Fed. Cir. 2022); *Chudik v. Hirshfeld*, 987 F.3d 1033, 1039 (Fed. Cir. 2021). Further consideration of *Chevron* and other issues can await other cases, such as one, if it arises, in which Commerce applies its broader language in *SWR Korea* to deny subtraction under § 1677a(c)(2)(A) to a § 201-based duty even if the proclamation imposing it insists that it is to be supplemental to antidumping duties.

## III

For the foregoing reasons, we conclude that the specific duty imposed by the President in Proclamation 9705 was properly treated by the President's subordinate, the Secretary of Commerce, as a "United States import dut[y]" under § 1677a(c)(2)(A). We therefore affirm the judgment of the Trade Court.

The parties shall bear their own costs.

**AFFIRMED**