Slip Op. 24-139

## UNITED STATES COURT OF INTERNATIONAL TRADE

NEIMENGGU FUFENG
BIOTECHNOLOGIES CO., SHANDONG
FUFENG FERMENTATION CO., LTD., and
XINJIANG FUFENG BIOTECHNOLOGIES
CO., LTD.,

        Plaintiffs,

   and

MEIHUA GROUP INTERNATIONAL
(HONG KONG) LIMITED, and XINJIANG
MEIHUA AMINO ACID CO., LTD.,

        Consolidated Plaintiffs,

   v.

UNITED STATES,

        Defendant.

Before: Gary S. Katzmann, Judge
Consol. Court No. 23-00068

## OPINION AND ORDER

[ Commerce's determination is sustained in part and remanded in part.  Defendant's motion to dismiss in part is granted. ]

Dated: <u>December 16, 2024</u>

<u>Dharmendra N. Choudhary</u>, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, of Washington, D.C., argued for the Plaintiffs.  With him on the briefs were <u>Ned H. Marshak</u>, <u>Brian M. Petelin</u>, <u>Elaine F. Wang</u>, and <u>Jordan C. Kahn</u>.

<u>Daniel Bertoni</u>, Trial Attorney, U.S. Department of Justice, Washington, D.C., argued for Defendant United States.  With him on the briefs were <u>Brian M. Boynton</u>, Principal Deputy Assistant Attorney General, <u>Patricia M. McCarthy</u>, Director, and <u>L. Misha Preheim</u>, Assistant Director.

Katzmann, Judge: <u>Xanthomonas campestris</u> is an obligately anaerobic, Gram-negative bacterium whose economic value far exceeds what its non-Latin name—the "cabbage black rot pathogen"—might suggest.[1] To be sure, that name is no misnomer: the bacterium afflicts crops of cabbage and related vegetables with darkening, wilting, and tissue death. But modern industrial science has put this stubborn pest to better use. At the right temperature, and under certain other conditions, the bacterium ferments simple sugars into a polysaccharide called xanthan gum—a substance commonly used as a tasteless thickener in foods, medicines, and toothpastes, and as an anti-separation agent in oil drilling. <u>See</u> Xanthan Gum from China, Inv. No. 731-TA-1203 (Second Review), USITC Pub. 5501 at 7 (Apr. 1, 2024).

While some xanthan gum production occurs within the United States, the U.S. market depends heavily on imports from overseas. <u>See</u> <u>id.</u> at 7. And for some of these imports, the enforcement of U.S. trade remedy laws presents a sticking point. Imports of xanthan gum from the People's Republic of China ("China") have been subject to an antidumping duty order imposed by the U.S. Department of Commerce ("Commerce") since 2013. <u>See</u> <u>Xanthan Gum from the People's Republic of China: Amended Final Determination of Sales at Less Than Fair Value and Antidumping Duty Order</u>, 78 Fed. Reg. 43143 (Dep't Com. July 19, 2013) ("<u>Antidumping Duty Order</u>").

This case involves a challenge to Commerce's eighth administrative review of the <u>Antidumping Duty Order</u>. <u>See</u> <u>Xanthan Gum from the People's Republic of China: Final Results</u>

---

[1] This background information appears in a series of exhibits to an administrative filing by a party to the agency proceeding underlying this case. The relevant exhibits are public documents but do not appear in the joint appendix. <u>See</u> Surrogate Value Cmts., Pt. 4 at Exs. 10A, 10E, Case No. A-570-985, Bar Code: 4227779-04 (Mar. 31, 2022).

of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021, 88 Fed. Reg. 9861 (Dep't Com. Feb. 15, 2023) ("Final Review"); Compl., Apr. 17, 2023, ECF No. 13 ("Compl."). Plaintiffs Neimenggu Fufeng Biotechnologies Co., Shandong Fufeng Fermentation Co., Ltd., and Xinjiang Fufeng Biotechnologies Co., Ltd. (collectively, "Fufeng") and Consolidated Plaintiffs Meihua Group International (Hong Kong) Limited and Xinjiang Meihua Amino Acid Co., Ltd. (collectively, "Meihua") are Chinese producers of xanthan gum whose U.S. imports are subject to antidumping duties imposed by that order.

Plaintiffs and Consolidated Plaintiffs each move for judgment on the agency record under United States Court of International Trade ("USCIT") Rule 56.2, arguing that four aspects of the Final Review are "unsupported by substantial evidence on the record, or otherwise not in accordance with law." 19 U.S.C. § 1516a(b)(1)(B)(i); see Pls.' Mot. for J. on the Agency R. at 1–3, Oct. 30, 2023, ECF No. 25 ("Pls.' Br."). Fufeng argues that (1) Commerce erred by directly valuing Fufeng's energy factors of production; that (2) Commerce incorrectly valued Fufeng's coal input under subheading 2701.12.9000 of the Harmonized Tariff Schedule ("HTS"); that (3) Commerce's application of the so-called "Cohen's $d$ test" for effect size as part of its "differential pricing methodology" was unlawful; and that (4) Commerce improperly deducted duties imposed pursuant to 19 U.S.C. § 2411 ("Section 301") from its calculation of export value. See Pls.' Br. at 1–3. In its own motion, Meihua adopts Fufeng's arguments and argues that any modified antidumping duty rate assigned to Fufeng should apply to Meihua as well. See Consol. Pls.' Mot. for J. on the Agency R. at 4, Oct. 30, 2023, ECF No. 26 ("Consol. Pls.' Br.").

Defendant the United States ("the Government") asks the court to deny Fufeng and Meihua's Rule 56.2 motions. See Def.'s Mot. to Dismiss in Part & Resp. Opp'n to Pls.' Mots. for

J. on the Agency R., Feb. 27, 2024, ECF No. 31 ("Gov't Br.").  The Government also moves to dismiss Count Six of Fufeng's complaint, which pertains to Commerce's application of the Cohen's *d* test, for lack of standing.  <u>See</u> USCIT R. 12(b)(1); Compl. ¶ 28.

For the reasons explained below, the court (1) remands the <u>Final Review</u> for Commerce's reconsideration or further explanation of its direct valuation of Fufeng's energy factors of production, (2) remands as well for Commerce's reconsideration of its classification of Fufeng's coal under a certain HTS subheading, conditional on a determination on remand to directly value Fufeng's coal, (3) dismisses Count Six of Fufeng's complaint for lack of standing, and (4) sustains the <u>Final Review</u> with respect to Commerce's deduction of Section 301 duties from its export value calculation.

## BACKGROUND

### I.        *Legal Background*

The court notes at the outset that this case involves a number of disparate concepts of trade law, and briefly summarizes some of these concepts below.

#### A.        *Antidumping Duties*

"Dumping occurs when a foreign company sells a product in the United States at a lower price than what it sells that same product for in its home market."  <u>Sioux Honey Ass'n v. Hartford Fire Ins. Co.</u>, 672 F.3d 1041, 1046 (Fed. Cir. 2012).  Where dumping occurs, federal law authorizes Commerce to impose an "antidumping duty . . . in an amount equal to the amount by which the normal value exceeds the export price (or the constructed export price) for the merchandise."

19 U.S.C. § 1673.[2]  This amount is the "dumping margin" of merchandise subject to the duty order issued by Commerce ("subject merchandise").  19 U.S.C. § 1677(25), (35)(A).

Each year after the publication of an antidumping duty order, Commerce (upon a party's request) must "review, and determine . . . the amount of any antidumping duty . . . ." Id. § 1675(a)(1)(B).  In conducting this administrative review, Commerce is to determine anew "the normal value and export price (or constructed export price) of each entry of the subject merchandise, and . . . the dumping margin for each entry."  Id. § 1675(a)(2)(A).

### B.   Calculating Normal Value Based on Factors of Production and General Expenses and Profits

Determining normal value can be an arduous task, particularly when the subject merchandise is exported from a non-market economy country like China.  Unlike for market economies, where normal value may be calculated on the basis of home-market prices, for non-market economies Commerce is directed to "determine the normal value of the subject merchandise on the basis of the value of the factors of production utilized in producing the merchandise . . . ." 19 U.S.C. § 1677b(c)(1)(B).  Among these "factors of production" is "energy and other utilities consumed."  Id. § 1677b(c)(3)(C).

Once Commerce calculates the value of the factors of production, there "shall be added an amount for general expenses and profit . . . based on the best available information regarding the

---

[2] Generally speaking, "normal value" is "the price at which the foreign like product is first sold (or, in the absence of a sale, offered for sale) for consumption in the exporting country, in the usual commercial quantities and in the ordinary course of trade."  19 U.S.C. § 1677b(a)(1)(B)(i).  And "[t]he term 'export price' means the price at which the subject merchandise is first sold (or agreed to be sold) before the date of importation by the producer or exporter of the subject merchandise outside of the United States to an unaffiliated purchaser in the United States or to an unaffiliated purchaser for exportation to the United States, as adjusted . . . ."  Id. § 1677a(a).

values of such factors in a market economy country." Id. § 1677b(c)(1)(B). These additional general expenses include "(1) factory overhead, (2) selling, general, and administrative expenses [("SG&A")], and (3) profit." Stanley Works (Langfang) Fastening Sys. Co. v. United States, 37 CIT 1369, 1374, 964 F. Supp. 2d 1311, 1319 (2013). To value them Commerce gathers "surrogate" data from producers of comparable items in market economy countries of a similar level of economic development to the subject country. Dorbest Ltd. v. United States, 30 CIT 1671, 1679, 462 F. Supp. 2d 1262, 1271 (2006). "Commerce values these expenses 'by using financial ratios derived from financial statements of producers of comparable merchandise in the surrogate country.'" Risen Energy Co. v. United States, __ F.4th __, __, No. 2023-1550, 2024 WL 5036188, at *1 (Fed. Cir. Dec. 9, 2024) (quoting Ad Hoc Shrimp Trade Action Comm. v. United States, 618 F.3d 1316, 1319 (Fed. Cir. 2010)).

Commerce "normally will use non-proprietary information gathered from producers of identical or comparable merchandise in the surrogate country" to value "manufacturing overhead, general expenses, and profit," 19 C.F.R. § 351.408(c)(3), and often relies on the classification scheme of the Harmonized Tariff Schedule of the United States as a basis for its item-to-item comparisons. See, e.g., Ancientree Cabinet Co. v. United States, 45 CIT __, __, 532 F. Supp. 3d 1241, 1262 (2021); Carbon Activated Tianjin Co. v. United States, 46 CIT __, __, 586 F. Supp. 3d 1360 (2022). "Commerce frequently uses import data from HTS categories as the 'best available information' to calculate a specific surrogate price by weight (or unit) for the input under the HTS category chosen," and "[i]n doing so . . . seeks to select the HTS category that most precisely corresponds to the particular input." Risen Energy, 2024 WL 5036188, at *3 (citation omitted). Commerce also "generally selects, to the extent practicable, surrogate values that are publicly

available, are product-specific, reflect a broad market average, and are contemporaneous with the period of review." Qingdao Sea-Line Trading Co. v. United States, 766 F.3d 1378, 1386 (Fed. Cir. 2014).

After gathering the "best available information" from surrogate producers of comparable merchandise, Commerce uses the following equation to derive an SG&A value to add to the value of the producer's factors of production (alongside overhead and profit). In the equation below, "MLE" denotes material, labor, and energy costs, subscript "S" indicates values derived from a surrogate producer's financial statements, and subscript "P" indicates the derived values that Commerce adds to the factors of production to calculate normal value pursuant to 19 U.S.C. § 1677b(c)(1)(B):

$$\frac{SG\&A_S}{MLE_S + Overhead_S} \times (MLE_P + Overhead_P) = SG\&A_P$$

Gov't Br. at 12; see also Dorbest, 30 CIT at 1715 n.36, 462 F. Supp. 2d 1301 n.36 (providing a detailed summary of each of Commerce's surrogate ratio calculations, including those used to calculate $MLE_P$ and $Overhead_P$); 19 U.S.C. § 1677b(e)(1)–(3).

This series of calculations includes, as relevant here, two separate junctures at which Commerce may account for energy costs in its calculation of normal value. The first is Commerce's direct calculation of the subject producer's "energy and other utilities consumed" factor of production. Id. § 1677b(c)(1)(B)–(3). The second is Commerce's calculation of the surrogate SG&A ratio (the fraction on the left side of the equation above): if the surrogate producer's reported SG&A value (denoted as "$SG\&A_S$" in the formula above) includes energy costs, meaning the numerator of the surrogate SG&A ratio is greater, then multiplying the surrogate SG&A ratio by the sum of the subject producer's MLE and Overhead expenses will in

turn yield a higher calculated subject-producer SG&A figure. And because Commerce includes this figure as part of the "general expenses" component of its normal value summation, 19 U.S.C. § 1677b(c)(1)(B), including a surrogate producer's energy expenses in its SG&A ratio numerator has the indirect effect of increasing normal value. See Risen Energy, 2024 WL 5036188, at *6 n.5 ("assum[ing]," on the basis of "the statutory scheme and the nature of the parties' dispute, that a larger overhead ratio correlates to an increase in normal value which, in turn, will lead to a higher dumping margin for an exporter.").

This introduces a possibility that Commerce will "double-count" energy in its normal value calculation—first by "directly" valuing the respondent's "energy and other utilities consumed" factor of production, id. § 1677b(c)(3)(C), and then by including energy costs in the numerator of the surrogate SG&A ratio. This outcome is disfavored. See Zhaoqing Tifo New Fibre Co. v. United States, 39 CIT 372, 375 n.6, 60 F. Supp. 3d 1328, 1333 n.6 (2015) (explaining that "the caselaw holds that, as a general rule, double counting is not permitted in antidumping margin calculations, because it is distortive, rendering margins less accurate.").

Commerce attempts to avoid double-counting through a stated policy whereby it directly values energy costs only in circumstances where it can ensure that it can isolate and remove energy costs from the numerator of the SG&A ratio. See Mem. from J. Maeder to L. Wang, re: Issues and Decision Memorandum for the Final Results of the 2020–2021 Antidumping Duty Administrative Review of Xanthan Gum from the People's Republic of China at 12 (Dep't Com. Feb. 1, 2023), P.R. 233 ("IDM") (citing Citric Acid and Certain Citrate Salts from the People's Republic of China, 74 Fed. Reg. 16838, 16838 (Dep't Com. Apr. 13, 2009) ("Citric Acid")). In Citric Acid, Commerce declined to directly value respondents' reported energy inputs because

"[w]e were unable to segregate and, therefore, were unable to exclude energy costs from the calculation of the surrogate financial ratios." 74 Fed. Reg. at 16839.

### C.      Commerce's Differential Pricing Methodology

As normal value and export price may each rest on aggregate data (that is, sets of multiple sales at different prices), Commerce calculates the difference between the two by calculating a weighted-average dumping margin. Ordinarily, Commerce "compar[es]. . . the weighted average of the normal values with the weighted average of the export prices. . . for comparable merchandise." 19 C.F.R. § 351.414(b)(1) (the "average-to-average," or "A-A method"). But the A-A method sometimes fails to detect "targeted" or "masked" dumping in a scenario where "a respondent's sales of low-priced 'dumped' merchandise would be averaged with (and offset by) sales of higher-priced 'masking' merchandise, giving the impression that no dumping was taking place." Stupp Corp. v. United States, 5 F.4th 1341, 1345 (Fed. Cir. 2021) (internal quotation marks and citation omitted). In this scenario Commerce is authorized by statute to use two additional methods to compare normal value of subject merchandise to the export price. See 19 U.S.C. § 1677f-1(d)(1). Of these, only the "average-to-transaction" ("A-T") method is relevant to this case. The A-T method "involves a comparison of the weighted average of the normal values to the export prices. . . of individual transactions for comparable merchandise," 19 C.F.R. § 351.414(b)(3), and is authorized only where "there is a pattern of export prices . . . for comparable merchandise that differ significantly among purchasers, regions, or periods of time." 19 U.S.C. § 1677f-1(d)(1)(B)(i).

To determine whether this statutory precondition is satisfied, Commerce conducts a sequence of statistical tests that it collectively terms a "differential pricing analysis." Stupp, 5 F.4th at 1346–47. The differential pricing analysis comprises the "Cohen's $d$ test," the "ratio test,"

and the "meaningful difference test." See Matra Ams., LLC v. United States, 48 CIT __, __, 681 F. Supp. 3d 1339, 1347–49 (2024) (describing each phase of the differential pricing analysis and recounting relevant litigation before the U.S. Court of Appeals for the Federal Circuit ("Federal Circuit")).[3] If the subject merchandise "passes" all three tests, Commerce applies the A-T methodology in accordance with its interpretation of the statutory condition imposed by 19 U.S.C. § 1677f-1(d)(1)(B).

### D.      Section 301 Duties

Section 301 of the Trade Act of 1974, Pub. L. 93-618, 88 Stat. 1978, 2041 (codified as amended at 19 U.S.C. § 2411), authorizes the United States Trade Representative ("USTR")[4] to impose duties ("Section 301 duties") on imported merchandise upon determining that "an act, policy, or practice of a foreign country is unreasonable or discriminatory and burdens or restricts United States commerce." Id. § 2411(b)(1)–(c)(1)(B). The President may also direct the USTR to begin such an investigation. See id. § 2411(b)(2).

---

[3] "The 'Cohen's *d* test' is Commerce's version of a general-purpose effect size metric devised in 1980 by statistician Jacob Cohen." Id. at __ n.3, 1348 n.3. The italicized "*d*" is a coefficient that denotes "a ratio whose numerator is the difference between means of the prices of the two groups and whose denominator is a figure, reflecting the general dispersion of the pricing data, that serves as a benchmark against which to judge the significance of the difference stated in the numerator." Mid Continent Steel & Wire, Inc. v. United States, 31 F.4th 1367, 1369 (Fed. Cir. 2022). According to Commerce, "[t]he Cohen's [*d*] test is a generally recognized statistical measure of the extent of the difference in the means between a test group and a comparison group." Differential Pricing Analysis; Request for Comments, 79 Fed. Reg. 26720, 26722 (Dep't Com. May 9, 2014) ("Differential Pricing Analysis").

[4] The USTR, whose office is "established within the Executive Office of the President," has "primary responsibility for developing, and for coordinating the implementation of, United States international trade policy," and "act[s] as the principal spokesman of the President on international trade." 19 U.S.C. § 2171.

The USTR's imposition of Section 301 duties may also have a downstream impact on Commerce's calculation of separate antidumping duties for products from the subject country. Under 19 U.S.C. § 1677a(c)(2)(A), export price is to be reduced by "the amount, if any, included in such price, attributable to any . . . United States import duties . . . ." The Federal Circuit has explained that "these adjustments [are] designed to produce an 'apples with apples' comparison between the price at which the merchandise is sold in the U.S. and the price at which it is sold in the home country." Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 63 F.4th 25, 28 (Fed. Cir. 2023) (quoting Smith-Corona Grp. v. United States, 713 F.2d 1568, 1578 (Fed. Cir. 1983)). But not all duties are deductible as "United States import duties." See id. at 32–33. Antidumping duties themselves, for example, are considered non-deductible "special duties" that are distinct from "United States import duties," because deducting them from the export price would create a circularity problem in which the antidumping duties would themselves lower the export price—and result in an inaccurately high dumping margin. See Power Steel Co. v. United States, 45 CIT __, __, 2021 WL 6098309 at *3 (2021) (citing Borusan Mannesmann Boru Sanayi ve Ticaret A.S. v. United States, 45 CIT__, __, 494 F. Supp. 3d 1365, 1376 (2021)).

The question in this case, as discussed below, is whether Commerce properly deducted the amount of a certain Section 301 duty imposed by the USTR from Fufeng's export price as an "amount . . . attributable to . . . United States import duties" under 19 U.S.C. § 1677a(c)(2)(A).

## II.    *Factual Background*

On September 7, 2021, Commerce initiated its eighth administrative review of the Antidumping Duty Order. See Initiation of Antidumping and Countervailing Duty Administrative Reviews, 86 Fed. Reg. 50034 (Dep't Com. Sept. 7, 2021), P.R. 30. Among seven Chinese producers of subject xanthan gum, Commerce selected only Fufeng—"the exporter that accounts

for the largest volume of subject merchandise that can reasonably be examined"—for individual examination. Mem. from R. Anadio to A. Elouaradia, re: Selection of Mandatory Respondent for Individual Examination at 1, 5 (Dep't Com. Oct. 21, 2021), P.R. 36, C.R. 9. Meihua was not selected for examination but participated in the underlying administrative review through the submission of documents and case briefs. See id.

On January 5, 2022, Commerce solicited the parties' comments on "the selection of surrogate values" for factors of production. See Mem. from S. Bailey to All Interested Parties, re: Request for Economic Development, Surrogate Country and Surrogate Value Comments and Information at 1–2 (Dep't Com. Jan. 5, 2022), P.R. 91. Both Fufeng and CP Kelco U.S., Inc. ("CP Kelco"), a U.S. producer of xanthan gum and an interested party to the administrative review,[5] submitted comments in response. See Letter from B. Mitchell, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, to G. Raimondo, Sec'y of Com., re: Fufeng's First Surrogate Value Comments (Resubmission) (Feb. 2, 2022, refiled Mar. 31, 2022), P.R. 147–150 ("Fufeng's Surrogate Value Cmts."); Letter from M. Kanna, Greenberg Traurig, LLP to G. Raimondo, Sec'y of Com., re: Surrogate Values (Feb. 2, 2022), P.R. 110–13 ("Pet'r's Surrogate Value Cmts.").

In August of 2022, eleven months after initiation, Commerce published the preliminary results of its review. See Xanthan Gum from the People's Republic of China: Preliminary Results of the Antidumping Duty Administrative Review, Partial Rescission of the Antidumping Duty Administrative Review, and Preliminary Determination of No Shipments; 2020-2021, 87 Fed. Reg. 47970, 47972 (Dep't Com. Aug. 5, 2022), P.R. 202 ("Preliminary Review"), and

---

[5] Despite having participated in the administrative review proceeding, CP Kelco is not a party to the present litigation before the court.

accompanying memorandum, Mem. from S. Fullerton to L. Wang, re: Preliminary Results of the Eighth Antidumping Duty Administrative Review of Xanthan Gum from the People's Republic of China (July 29, 2022), P.R. 196 ("PDM"). Commerce simultaneously issued a memorandum in which it announced its selection of Malaysia as "the primary surrogate country for the valuation of the [factors of production]," and "identfie[d] the data sources and values, and detail[ed] the analysis Commerce conducted[,] to determine the values assigned to the factors of production . . . in order to calculate normal value" for the Preliminary Review. Mem. from R. Anadio to The File, re: Fufeng's Preliminary Surrogate Value at 1–2, 13–14 (July 29, 2022), P.R. 197 ("Prelim. Surrogate Value Mem."). This memorandum included, as an attachment, a spreadsheet detailing Commerce's preliminary surrogate value data and including, at the "Fin Ratio" tab, a calculation of the preliminary surrogate SG&A ratio. See Surrogate Value Spreadsheet (July 29, 2022), P.R. 198 ("Prelim. Surrogate Value Spreadsheet").

Commerce preliminarily determined that Fufeng did not make sales at less than fair value during the period of review, and calculated a preliminary dumping margin of zero percent. See Preliminary Review, 87 Fed. Reg. at 47971. Commerce explained that in reaching this result it employed the standard A-A method to compare normal value to export value, and also noted that it included energy expenses in the numerator of the surrogate SG&A ratio. PDM at 17, 20. Commerce based its SG&A calculation on surrogate information drawn from the 2021 public financial statement of Ajinomoto (Malaysia) Berhad[6] ("Ajinomoto"), a Malaysia-based sub-entity of a Japanese company that produces monosodium glutamate ("MSG"), a chemical flavor enhancer. Id. at 21.

_____

[6] "Berhad" is Malay for "limited" in the sense of "limited liability."

Commerce invited parties to the administrative review to submit case briefs by thirty days after the publication of the Preliminary Review, and later extended this deadline to September 12, 2022. See Prelimiary Review, 87 Fed. Reg. at 47972; Letter from S. Bailey to All Interested Parties, re: Case Brief Extension Request, Case No. A-570-985, Bar Code: 4281259-01 (Dep't Com. Sept. 2, 2022) ("Case Br. Extension Letter"). Fufeng, Meihua, and CP Kelco each timely filed a case brief in response to Commerce's invitation. See Letter from D. Craven, Craven Trade Law LLC, to G. Raimondo, Sec'y of Com., re: Meihua's Case Brief (Sept. 12, 2022), P.R. 208; Letter from B. Mitchell, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, to G. Raimondo, Sec'y of Com., re: Fufeng's Case Brief (Sept. 12, 2022), P.R. 209 ("Fufeng's Case Br."); Letter from M. Kanna, Greenberg Traurig LLP, to G. Raimondo, Sec'y of Com., re: Case Brief of CP Kelco U.S. (Sept. 12, 2022), P.R. 211, C.R. 173 ("Pet'r's Case Br.").

Fufeng then submitted what it styled a "rebuttal brief." See Letter from B. Mitchell, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, to G. Raimondo, Sec'y of Com., re: Fufeng's Rebuttal Case Brief (Sept. 21, 2022) (rejected and retained), P.R. 214, C.R. 175 ("First Rejected Rebuttal"). CP Kelco requested that Commerce reject this submission, arguing that "Fufeng's Rebuttal Brief responds to arguments not raised by Petitioner in its [case brief]" in violation of 19 C.F.R. § 351.309(d)(2), and that "Fufeng's Rebuttal Brief contains factual information not already present on the record of this segment, making it untimely filed." Letter from M. Kanna, Greenberg Traurig LLP to G. Raimondo, Sec'y of Com., re: Request to Reject Fufeng's Rebuttal Brief at 1–2 (Sept. 12, 2022), P.R. 216.

Commerce informed Fufeng that it would reject certain elements of Fufeng's rebuttal brief in accordance with CP Kelco's request. See Letter from S. Bailey to B. Petelin, Grunfeld,

Desiderio, Lebowitz, Silverman & Klestadt LLP, re: Rejection Letter (Nov. 18, 2022), P.R. 223, C.R. 176 ("Rejection Letter"). Commerce requested Fufeng's resubmission of its rebuttal brief with certain redactions, id. at 4. Fufeng submitted a redacted document, see Letter from D. Choudhary, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, to G. Raimondo, Sec'y of Com., re: Fufeng's Resubmission of Redacted Rebuttal Case Brief (Nov. 21, 2022) (rejected and retained), P.R. 227, C.R. 177 ("Second Rejected Rebuttal"), but Commerce rejected that submission as well, explaining that "Commerce has identified additional parts in Fufeng's Redacted Rebuttal Case Brief subject to rejection." Letter from S. Bailey to B. Petelin, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, re: Second Rejection Letter at 2 (Dec. 12, 2022), P.R. 229 ("Second Rejection Letter"). Fufeng then submitted a third version of its rebuttal brief, see Letter from D. Choudhary, Grunfeld, Desiderio, Lebowitz, Silverman & Klestadt LLP, to G. Raimondo, Sec'y of Com., re: Fufeng's Resubmission of Redacted Rebuttal Case Brief (Dec. 14, 2022), P.R. 231, C.R. 178 ("Fufeng's Rebuttal Br."), which remains on the administrative docket and is the version that Commerce considered in preparing its Final Review.

On February 15, 2023, Commerce published the final results of its administrative review. See Final Review; IDM. Commerce published a final dumping margin for Fufeng of 17.36 percent—up from the preliminary margin of zero percent—for Fufeng and Meihua. Final Review, 88 Fed. Reg. at 9862. Commerce continued to use the A-A method to compare normal value to export price. IDM at 34. Commerce also explained that for the Final Review, consistent with the calculation method it had adopted (but not explicitly addressed) in the Preliminary Review, it deducted the amount of Section 301 duties from its calculation of Fufeng's export price. Id. at 32. But Commerce explained that in a departure from the Preliminary Review, it directly valued

Fufeng's reported energy factors of production and correspondingly removed what it considered to be energy expenses from the numerator of the surrogate SG&A ratio. Id. at 11–14.

Commerce also issued a pair of memoranda, detailing the agency's general and factors of production–specific calculations, in conjunction with the IDM. See Mem. from R. Anadio to The File, re: Final Analysis (Feb. 1, 2023), P.R. 234, C.R. 179 ("Final Calculation Mem."); Mem. from R. Anadio to The File, re: Final Surrogate Value Mem. (Feb. 1, 2023), P.R. 235–36 ("Final Surrogate Value Mem.").

### III.    Procedural History

Fufeng timely commenced this action, filing a summons on March 16, 2023 and a complaint on April 17, 2023. See Summons, Mar. 16, 2023, ECF No. 1; Compl. On July 5, 2023, the court granted the Government's consented-to motion to consolidate this case with a separate action initiated by Meihua, and the two cases were consolidated under Consolidated Court Number 23-00068. See Order, July 5, 2023, ECF No. 22. Fufeng and Meihua timely filed their respective motions[7] for judgment on the agency record on October 30, 2023. See Pls.' Br.; Consol. Pls.' Br.

The Government filed its response on February 27, 2024, asking the court to dismiss Count Six of Fufeng's complaint and deny both motions for judgment on the agency record. See Gov't Br. Fufeng (but not Meihua) filed a reply, see Pls.' Reply to Def.'s Resp. to Pls.' Mot. for J. on the Agency R., May 3, 2024, ECF No. 34 ("Pls.' Reply"), and subsequently moved for oral argument. See Mot. for Oral Arg., May 24, 2024, ECF No. 37. The court granted this unopposed motion and issued questions in advance of oral argument to Fufeng and the Government, see Ct.'s

---

[7] Fufeng initially challenged seven aspects of the Final Review. See generally Compl. Fufeng now seeks judgment on the agency record as to only Counts One, Two, Five, Six, and Seven of its complaint. See Pls.' Br at 1–3; see generally Compl.

Letter re: Qs. for Oral Arg., Aug. 7, 2024, ECF No., 42, to which those parties filed written responses. See Def.'s Resps. to Ct.'s Qs. for Oral Arg., Sept. 4, 2024, ECF No. 43 ("Gov't OAQ Resp."); Pls's Resps. to the Ct.'s Qs. for Oral Arg., Sept. 4, 2024, ECF No. 44 ("Pls.' OAQ Resp.").

At oral argument, which took place on September 11, 2024, the court invited Fufeng and the Government to file supplemental post-argument submissions. Both did so. See Def.'s Post-Arg. Subm., Sept. 20, 2024, ECF No. 47 ("Def.'s Post-Arg. Subm."); Pls.' Post-Arg. Subm., Sept. 20, 2024, ECF No. 48 ("Pls.' Post-Arg. Subm.").

With all filings now in hand, the court turns to the merits of the case.

## JURISDICTION AND STANDARD OF REVIEW

Jurisdiction lies under 28 U.S.C. § 1581(c), which grants the U.S. Court of International Trade "exclusive jurisdiction of any civil action commenced under section 516A or 517 of the Tariff Act of 1930." When reviewing antidumping determinations, the court is to sustain "'any determination, finding or conclusion found' by Commerce unless it is 'unsupported by substantial evidence on the record, or otherwise not in accordance with the law.'" Fujitsu Gen. Ltd. v. United States, 88 F.3d 1034, 1038 (Fed. Cir. 1996) (quoting 19 U.S.C. § 1516a(b)(1)(B)).

"Substantial evidence" refers to "such evidence that a reasonable mind might accept as adequate to support a conclusion." SeAH Steel VINA Corp. v. United States, 950 F.3d 833, 840 (Fed. Cir. 2020) (internal quotation marks and citation omitted). This requires support from "less than the weight of evidence but more than a mere scintilla of evidence." Elbit Sys. of Am., LLC v. Thales Visionix, Inc., 881 F.3d 1354, 1356 (Fed. Cir. 2018) (internal quotation marks and citation omitted). Substantial evidence must account for "contradictory evidence or evidence from which conflicting inferences could be drawn." Suramerica de Aleaciones Laminadas, C.A. v.

United States, 44 F.3d 978, 985 (Fed. Cir. 1994) (internal quotation marks and citation omitted).

An explicit statement of reasoning is not required: the court may uphold an agency's action even

where "the agency's decisional path" is merely "reasonably discernable." Wheatland Tube Co. v.

United States, 161 F.3d 1365, 1369–70 (Fed. Cir. 1998).

Commerce is also required by statute to provide "an explanation of the basis for its

determination that addresses relevant arguments, made by interested parties who are parties to the

investigation or review." 19 U.S.C. § 1677f(i)(3)(A).

## DISCUSSION

### I.      Commerce's Direct Valuation of Fufeng's Energy Factors of Production Is Unsupported by Substantial Evidence as Currently Explained.

Commerce did not directly value Fufeng's reported energy costs in its normal value

calculation in the Preliminary Review, and instead included an "administrative and other

expenses" line item reported by surrogate Malaysian MSG producer Ajinomoto in the numerator

of the surrogate SG&A ratio. See Prelim. Surrogate Value Mem. at 3, 5. But in the Final Review,

Commerce directly valued Fufeng's reported energy costs and moved the "administrative and

other expenses" line item to the MLE portion of the denominator of the SG&A ratio. See IDM at

12–13. This change, Commerce explained, reflected a corresponding change in the way

Ajinomoto reported its costs in its financial statements. Whereas during previous administrative

reviews of the Antidumping Duty Order Ajinomoto had reported an "other operating expenses"

line item in its annual financial statements, in the 2021 financial statement it split this line item

into two new line items: "selling and distribution expenses" and "administrative and other

expenses." Id.; see also Pet'r's Surrogate Value Cmts. at Ex. 9. Commerce explained its reaction

to this change as follows:

[U]nlike prior reviews, the 2021 financial statements of Ajinomoto (Malaysia) breaks out the SG&A expense line item for "other operating expenses" into two sub-line items, "selling and distribution expenses," and "administrative and other expenses." The presentation of the 2021 financial statements of Ajinomoto (Malaysia) are otherwise identical to the financial statements relied on in previous reviews.

For purposes of the final results, we determine that energy costs in the 2021 financial statements of Ajinomoto (Malaysia) are not captured in the "selling and distribution expenses" sub-line item for "other operating expenses." We find it is reasonable to conclude that electricity purchases would not fall under a line item for sales and distribution costs. Therefore, following that conclusion, we determine that energy costs are contained in the "administrative and other expenses" sub-line item of the 2021 financial statements of Ajinomoto (Malaysia). Further, we find that all other line items that comprise SG&A in the 2021 financial statements of Ajinomoto (Malaysia) have no direct or tangential descriptions that could capture energy expenses. This conclusion is consistent with prior reviews in which Commerce determined that energy costs in the financial statements of Ajinomoto (Malaysia) fell under the "other operating expenses" line item, and not under any other line item.

Id. at 13 (footnotes omitted). Commerce appears to have expressed the following point in these two paragraphs: whereas before the line-item split it was impossible to determine how much of Ajinomoto's "other operating expenses" represented energy costs, the split allowed Commerce to treat the "administrative and other expenses" subcategory as an adequately specific stand-in for energy costs. Id. Commerce seemingly supposed, in other words, that the removal of the obviously non-energy-related "selling and distribution expenses" element from a catchall "operating expenses" line item would result in a more targeted line item that, even if not literally labeled "energy expenses," would nevertheless constitute a workable metric for the purpose of avoiding a double-count of energy costs. See IDM at 13.

Commerce went on to cite Chlorinated Isocyunarates from the People's Republic of China: Final Results of Antidumping Duty Administrative Review; 2010–2011, 78 Fed. Reg. 4386 (Dep't Com. Jan. 22, 2013) ("Chlorinated Isocyunarates") and accompanying Issues and Decision Mem.

("Chlorinated Isocyunarates IDM") as an example of a past administrative review where Commerce removed an energy-related line item from the numerator of the surrogate SG&A ratio and instead directly valued a respondent's energy factor of production. Id. at 13–14. "The reasoning in Chlorinated Isocyanurates is applicable here," Commerce explained, "given that the 'administrative and other expenses' sub-line item in the 2021 financial statements of Ajinomoto (Malaysia) may include electricity expenses as well as expenses not related to electricity." Id. at 14 (underline added).

Fufeng argues that Commerce improperly treated "administrative and other expenses" line item as an isolatable stand-in for energy, as the line item is instead "a residual basket category encompassing myriad and disparate administrative and non-energy-related miscellaneous expenses." Pls.' Br. at 18. "Moreover," Fufeng argues, "there is no evidence that energy costs are a predominant component of this basket category line item." Id. Fufeng further avers that Commerce's resulting allocation of the "administrative and other expenses" line item to the MLA portion of the denominator of the surrogate SG&A ratio distorted the ultimate dumping margin calculation. Id. at 18–20.

Fufeng's concerns make intuitive sense. It does seem odd that such a generic-seeming line item as "administrative and other expenses" would primarily refer to an expense category as specific as energy. At the same time, the existence of colorable concerns about Commerce's factor-of-production valuation does not necessarily mean that that valuation is unsupported by substantial evidence. The question before the court is not whether Commerce made the only supportable determination on the basis of the record. "Where two different, inconsistent conclusions may reasonably be drawn from the evidence in record, an agency's decision to favor

one conclusion over the other is the epitome of a decision that must be sustained upon review for substantial evidence." Pokarna Engineered Stone Ltd. v. United States, 56 F.4th 1345, 1349 (Fed. Cir. 2023) (alterations omitted) (quoting In re Jolley, 308 F.3d 1317, 1329 (Fed. Cir. 2002)). Nor does the substantial-evidence standard require that Commerce have made the best possible determination among reasonable alternatives—a determination can be supported by substantial evidence even where it rests on "less than the weight of the evidence . . . ." Elbit, 881 F.3d at 1356. And as the Government points out, Commerce's valuation of factors of production is an area of even-broader-than-usual statutory discretion. See Gov't Br. at 17–18; see also Nation Ford Chem. Co. v. United States, 166 F.3d 1373, 1377 (Fed. Cir. 1999) (collecting cases and explaining that 19 U.S.C. § 1677b(c) provides "guidelines," but "accords Commerce wide discretion in the valuation of factors of production in the application of those guidelines").

But while "each administrative review is a separate exercise of Commerce's authority that allows for different conclusions based on different facts in the record," and while "Commerce may change its conclusions from one review to the next based on new information and arguments," Commerce must nevertheless "articulate[] a reasonable basis for the change." Qingdao Sea-Line, 766 F.3d at 1387. And here, Commerce did not adequately explain why isolating Ajinomoto's new "administrative and other expenses" line item as an energy expense was a permissible exercise of its "wide discretion." Nation Ford, 166 F.3d at 1377.

Commerce acknowledged in the IDM that in prior administrative reviews of the Antidumping Duty Order it had opted against direct valuation because "the surrogate financial statements of Ajinomoto (Malaysia) on which Commerce relied did not separately break out energy costs from selling expenses or G&A." IDM at 12 (referring, in the final abbreviation, to a

"general and administrative expenses" sub-component of SG&A). But the financial reporting change on which Commerce premised its decision to directly value Fufeng's energy factors of production subtracted only "selling and distribution expenses" from the line item that Commerce had in earlier administrative reviews considered too broad to permit direct valuation. See id. at 12–13.

Commerce did not explain why the narrower "administrative and other expenses" line item—which it now considers to house energy expenses—does not continue to blend those expenses with the "G&A" expenses that remained within the line item even after Ajinomoto's spin-off of "selling and distribution" expenses. Nor did Commerce point to any evidence that energy expenses predominate over G&A within "administrative and other expenses," or over any other type of expense that might fall under that imprecisely-worded line item.

Commerce has thus failed to articulate why, if the Citric Acid approach precluded direct valuation of energy in previous administrative reviews of the Antidumping Duty Order, the disaggregation of "selling and distribution expenses" from "other operating expenses" would for the first time allow Commerce "to segregate and, therefore . . . exclude energy costs from the calculation of the surrogate financial ratios." Citric Acid, 74 Fed. Reg. at 16839. This means that Commerce did not fulfill its statutory duty to provide "an explanation of the basis for its determination that addresses relevant arguments, made by interested parties who are parties to the investigation or review." 19 U.S.C. § 1677f(i)(3)(A); see also Fufeng's Rebuttal Br. at 11 (insisting, among other points, that "the issue is whether there is a separate line item in the surrogate financial statement for energy expenses").

Commerce's analogy to Chlorinated Isocyunarates, 78 Fed. Reg. 4386, does not render its "decisional path . . . reasonably discernable" on review. Wheatland Tube, 161 F.3d at 1369–70; see IDM at 13–14. Commerce explained as follows:

> In Chlorinated Isocyanurates, Commerce treated certain line items in the surrogate financial statements (i.e., rental, light, janitorial and security expenses) as energy expenses and excluded them from the surrogate ratio calculations despite our acknowledgement "that this line item may include certain expenses that are not related to electricity" in order "to avoid double counting of electricity costs, and likewise ensure we account for energy intensive nature of the production process by using the reported electricity [factors of production]." The reasoning in Chlorinated Isocyanurates is applicable here, given that the "administrative and other expenses" sub-line item in the 2021 financial statements of Ajinomoto (Malaysia) may include electricity expenses as well as expenses not related to electricity.

Id. at 14 (footnote omitted) (quoting Chlorinated Isocyanurates IDM at Cmt. 13). This may well have been a rational comparison. But even the direct applicability of Chlorinated Isocyanurates's reasoning would leave open a key question that Commerce's IDM does not answer: if Chlorinated Isocyanurates supports treating "administrative and other expenses" as energy expenses, why should it not also have supported treating "other operating expenses" as energy expenses in previous administrative reviews of the Antidumping Duty Order?

Because "the orderly functioning of the process of review requires that the grounds upon which the administrative agency acted be clearly disclosed and adequately sustained," SEC v. Chenery Corp., 318 U.S. 80, 94 (1943), the court remands this element of the Final Review for Commerce's reconsideration or further explanation. The court does not compel a result on remand. Commerce may, for instance, attempt to explain why the change in Ajinomoto's financial reporting between prior administrative reviews and the Final Review constitutes substantial evidence for the direct valuation of Fufeng's reported energy costs. Alternatively, perhaps, Commerce may attempt

to explain its rationale for any change in agency practice that the direct-valuation determination in this case might represent.

### II. Fufeng's Non-Exhaustion of its Challenge to the Valuation of Coal Under HTS 2701.12.9000 Does not Preclude Judicial Review, and the Government Has Waived any Opposition on the Merits.

Fufeng next challenges a feature of the direct valuation itself, arguing that Commerce's valuation of coal under HTS 2701.12.9000 ("Coal, Whether Or Not Pulverised, But Not Agglomerated: Bituminous Coal: O/T Coking Coal"), as opposed to HTS 2701.19 ("Coal, Other Than Anthracite Or Bituminous, Whether Or Not Pulverized, But Not Agglomerated"), is unsupported by substantial evidence. Pls.' Br. at 22. Fufeng specifically argues that (1) the heat value of Fufeng's coal is too low to warrant the coal's categorization under HTS 2701.12.9000, that (2) Fufeng uses non-coking-grade coal, which similarly means that that subheading is inapplicable, that (3) agency and USCIT precedent supports the assignment of HTS 2701.19 to "bituminous coal having the same range of heat value as Fufeng's energy coal," that (4) the court in fact "rejected" the assignment of 2701.12.9000 to similar coal in Carbon Activated Tianjin Co. v. United States, 47 CIT __, 650 F. Supp. 3d 1354 (2023), and that (5) Commerce is bound to follow its "ordinary practice" of assigning HTS 2701.19 to the type of coal used by Fufeng. See Pls.' Br. at 22–26.

The Government does not engage with any of these arguments. Instead, the Government points out that Fufeng did not exhaust them during the administrative proceeding below and states that "the [c]ourt should not reach the merits" of them. Gov't Br. at 19.[8]

---

[8] The Government also states that "Fufeng does not provide an explanation for why it failed to raise this issue in its initial case brief." Id. at 24. But the Government points to no authority for the proposition that a movant under USCIT Rule 56.2 must affirmatively demonstrate its

It is true that these arguments, as Fufeng develops them in its brief, do not appear in the record on which Commerce based its determination. Fufeng did not raise (or attempt to raise) the HTS subheading assignment issue in its opening administrative case brief. See Fufeng's Case Br.; see also Qingdao Taifa Grp. v. United States, 33 CIT 1090, 1092–93, 637 F. Supp. 2d 1231, 1236 (2009) (explaining that "[t]o exhaust its administrative remedies, a party usually must submit a case brief 'presenting all arguments that continue in its view to be relevant to Commerce's final determination or final results.'" (alterations omitted) (quoting 19 C.F.R. § 351.309(c)(2))). Fufeng first attempted to raise the HTS subheading assignment issue in its rebuttal brief. See First Rejected Rebuttal at 29–33. But Commerce rejected that submission[9] and provided the following explanation in a letter to Fufeng's counsel:

> Commerce is rejecting and removing Fufeng's September 21, 2022, rebuttal brief submission from the record pursuant to 19 CFR [§] 351.309(d)(2) as it contains factual information not already present on the record of this segment, making it untimely filed. Further, Commerce is also rejecting and removing Fufeng's September 21, 2022 rebuttal brief submission from the record pursuant to 19 CFR [§] 351.302(d) as it contains unsolicited new factual information (i.e., surrogate value HTS selection for coal . . . ).

---

administrative exhaustion of each of the arguments it raises in its opening brief. Cf. Jones v. Bock, 549 U.S. 199, 212 (2007) (collecting cases involving a variety of statutory schemes and explaining that "the usual practice under the Federal Rules [of Civil Procedure] is to regard exhaustion as an affirmative defense." (emphasis added)); cf. also Aluminum Extrusions Fair Trade Comm. v. United States, 37 CIT 1482, 1484, 938 F. Supp. 2d 1337, 1340 (2013) (referring to "the doctrine of exhaustion of administrative remedies" as an "affirmative defense" in the context of a USCIT Rule 56.2 motion for judgment on the agency record).

[9] Because (as explained below) the court excuses Fufeng's non-exhaustion of its argument on the HTS subheading assignment issue, the court has no occasion to address Fufeng's separate argument that Commerce unlawfully declined to consider certain submissions. See Compl. ¶ 30; Pls.' Br. at 26–29; Pls.' Reply at 2.

Rejection Letter at 2. Fufeng attempted to raise the issue again when it resubmitted its rebuttal

brief, see Second Rejected Rebuttal at 29–33, but Commerce rejected that submission as well:

> Commerce has identified additional parts in Fufeng's Redacted Rebuttal Case Brief subject to rejection. In Fufeng's Redacted Rebuttal Case Brief, Fufeng challenged the surrogate value Harmonized Tariff Schedule (HTS) selection for coal. Although the petitioner argued for directly valuing reported energy FOP in its normal value calculation, the petitioner did not challenge Commerce's surrogate value selection (i.e., surrogate value HTS selection for coal). However, Fufeng challenged Commerce's surrogate value selection (i.e., surrogate value HTS selection for coal) in Fufeng's Redacted Rebuttal Case Brief.

Second Rejection Letter at 2 (footnote omitted). Commerce accepted Fufeng's third submission.

See Fufeng's Rebuttal Br. But that submission did not contain any argument that HTS 2701.19,

rather than HTS 2701.12.9000, should be used to directly value Fufeng's coal. See id. Neither,

as a result, does the official record on which Commerce based its determination.[10]

The circumstances of this case nevertheless warrant an exception to the ordinary

exhaustion requirement, whose operation the Government appears to have assumed. See Gov't

Br. at 23–24. As a statutory matter, "the Court of International Trade shall, where appropriate,

require the exhaustion of administrative remedies." 28 U.S.C. § 2637(d). This ordinarily means

that a party's "failure to raise its issue in its administrative case brief constitute[s] a failure to

exhaust administrative remedies," which in turn precludes judicial consideration of the issue in

subsequent litigation. Dorbest Ltd. v. United States, 604 F.3d 1363, 1375 (Fed. Cir. 2010); see

also Corus Staal BV v. United States, 502 F.3d 1370, 1379 (Fed. Cir. 2007) ("[T]he Court of

International Trade generally takes a strict view of the requirement that parties exhaust their

---

[10] The parties' joint appendix does include stricken copies of Fufeng's rejected filings that Commerce retained "solely for the purpose of establishing and documenting the basis for its rejection." Second Rejection Letter; see First Rejected Rebuttal; Second Rejected Rebuttal.

administrative remedies before the Department of Commerce in trade cases." (internal quotation marks and citations omitted)).

But as § 2637(d)'s use of "where appropriate" implies, there also exist circumstances where requiring exhaustion would be inappropriate. See CEMEX, S.A. v. United States, 133 F.3d 897, 905 (Fed. Cir. 1998); see also Luoyang Bearing Factory v. United States, 26 CIT 1156, 1186 n.26, 240 F. Supp. 2d 1268, 1297 n.26 (2002) ("By its use of the phrase 'where appropriate,' Congress vested discretion in the Court to determine the circumstances under which it shall require the exhaustion of administrative remedies."). In the past, the court has not required exhaustion in situations that include where: "(1) [the] plaintiff's argument involves a pure question of law; (2) there is a lack of timely access to the confidential record; (3) a judicial decision rendered subsequent to the administrative determination materially affected the issue; or (4) raising the issue at the administrative level would have been futile." Ninestar Corp. v. United States, 48 CIT __, __, 687 F. Supp. 3d 1308, 1326 (2024) (quoting Gerber Food (Yunnan) Co. v. United States, 33 CIT 186, 193, 601 F. Supp. 2d 1370, 1377 (2009)).

One of the circumstances that warrant the court's excusal of non-exhaustion is where a "party ha[s] no opportunity to raise [an] issue before the agency," Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1381 (Fed. Cir. 2013) (internal quotation marks and citations omitted), including where "the agency change[s] its position . . . after the party's case brief would have been filed." Corus Staal, 502 F.3d at 1381. In other words, if Commerce's adoption of a new position after the regulatory deadline for filing a case brief deprives a party of a meaningful opportunity to challenge the new position during the agency proceeding, the court in its discretion may excuse the non-exhaustion of any arguments related to the out-of-time challenge.

Or, as the court held in Qingdao Taifa, "[a] party . . . may seek judicial review of an issue that it did not raise in a case brief if Commerce did not address the issue until its final decision, because in such a circumstance the party would not have had a full and fair opportunity to raise the issue at the administrative level." 33 CIT at 1093, 637 F. Supp. 2d at 1236.

That circumstance pertains here. Fufeng's deadline for filing a case brief—which Commerce extended by six calendar days—was September 12, 2022. See Case Br. Extension Letter. At that point, only the farthest-gazing of auguries could have supported an expectation that Commerce would directly value of Fufeng's coal under HTS 2701.12.9000.

Fufeng's response to Commerce's January 5, 2022 request for surrogate value information included a "Summary of Suggested Malaysian Surrogate Values" listing a "Malaysia HTS" of "270119" for "COAL." See Request for Info; Fufeng's Surrogate Value Cmts. at Ex. 1, 2. Commerce then listed "2701129000" as the "Malaysia HTS Number" for "Coal" on row 31 of a list of 106 factors of production. Prelim. Surrogate Value Spreadsheet at tab SV, cell D32. (The other 105 factors of production listed in this tab include, exempli gratia, "Corn Embryo," "Corn Rejects," "Wooden Pallet," and "Carton." Id.).

The Government argues that Commerce's issuance of this spreadsheet put Fufeng on notice, forty-five days before the eventual case brief deadline, that Commerce would value coal under HTS 2701.12.9000 in a direct-valuation scenario—and that Fufeng's subsequent omission of any discussion of the HTS subheading assignment issue in its case brief constitutes an inexcusable failure to exhaust the arguments Fufeng now presents. See Gov't Br. at 24. Because "Fufeng itself proposed a HTS number for coal, which Commerce declined to select," contends the Government, "Fufeng was therefore aware that Commerce desired information on its coal

inputs and also that Commerce had selected an HTS number for coal that Fufeng had not proposed." Id. (citations omitted). The Government further argues that the court's "exhaustion analysis should be guided by" Boomerang Tube LLC v. United States, 856 F.3d 908 (Fed. Cir. 2017). Def.'s Post-Arg. Subm. at 2. In that case, the Federal Circuit rejected "the proposition that Commerce must expressly notify interested parties any time it intends to change its methodology between its preliminary and final determinations, despite the inclusion of the relevant data in the record and the advancement of arguments related to that data before Commerce." Boomerang Tube, 856 F.3d at 913.

This misses the mark in two ways. The first is that the HTS (sub)-headings that Commerce listed in its Preliminary Surrogate Value Spreadsheet do not by their terms pertain to Fufeng's factors of production. The spreadsheet instead represents Commerce's implementation of 19 U.S.C. § 1677b(c)(4), under which Commerce, "in valuing factors of production under paragraph (1), shall utilize, to the extent possible, the prices or costs of factors of production in one or more market economy countries that are (A) at a level of economic development comparable to that of the nonmarket economy country, and (B) significant producers of comparable merchandise." Id. The referenced "paragraph (1)," in turn, provides that "the valuation of the factors of production shall be based on the best available information regarding the values of such factors in a market economy country or countries considered to be appropriate by the administering authority." Id. § 1677b(c)(1).

Commerce's listing of "2701129000" in the same row as "Coal," in other words, does not even propose to value Fufeng's coal under that subheading—it instead associates "2701129000" with an abstract category of "coal" derived from a database of "Malaysian import prices . . .

published by the Global Trade Atlas (GTA)." Prelim. Surrogate Value Mem. at 2. Fufeng could not have reasonably predicted that Commerce would extend this association—between an HTS subheading and a grouping of Malaysian price data—as a means of directly valuing the specific coal that Fufeng uses to power its xanthan gum production. The Government does not identify any statute, regulation, or agency practice that would have supported a reasonable expectation that Commerce would use a surrogate-country HTS subheading assignment to directly value a respondent's energy factor of production instead of continuing to include energy expenses in the numerator of the SG&A ratio for Ajinomoto.

The Government's argument also goes astray for the reason that Fufeng, at the time of the case brief deadline, had no reason to expect that Commerce would directly value Fufeng's coal at all. Commerce had not directly valued Fufeng's energy inputs in any of the three administrative reviews immediately preceding the one at issue in this case. See, e.g., Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2017-2018 (Dep't Com. Nov. 25, 2019) and accompanying Issues and Decision Mem. at Cmt. 4. And during the administrative proceeding underlying the Final Review, neither Commerce nor any party referenced the possibility of direct valuation until September 12, 2022—the date of the case brief deadline—when Petitioner CP Kelco raised the issue in its submission. See Pet'r's Case Br. at 2–19. CP Kelco argued in that submission that "substantial record evidence in this segment indicates that Fufeng's energy costs should be valued directly and included in the calculation of Fufeng's [Cost of Manufacture], unlike [Commerce]'s treatment of energy costs in the past three administrative reviews." Id. at 2. As Fufeng notes, the presentation of this argument constituted the first meaningful indication to Fufeng that the direct

valuation of energy inputs might be a matter under Commerce's consideration.  See Pls.' Post-Arg. Subm. at 4.

CP Kelco's filing also marked the first time at which Fufeng could have reasonably appreciated the importance of arguing that its coal should be valued under HTS 2701.19 instead of HTS 2701.12.9000.  At the time of the Preliminary Results, Commerce indicated that it would disregard Fufeng's reported energy input values and instead include Ajinomoto's "administrative and other expenses" line item in the numerator of the surrogate SG&A ratio.  See Prelim. Surrogate Value Mem. at 3; IDM at 12–13.  This means that even if Fufeng could have somehow intuited that Commerce's inclusion of "2701129000" in the Preliminary Surrogate Value Spreadsheet might convey information about Commerce's hypothetical direct valuation of Fufeng's coal, it would have been academic (if not outright impertinent) to argue that HTS 2701.19 should be assigned to a value that Commerce had stated it would disregard.  Without the direct valuation of energy, Commerce's classification of Fufeng's coal would not have affected the ultimate normal value calculation.  Fufeng thus had no reason to pursue the administrative remedy that the Government argues it should have pursued.

It cannot be, in other words, that Fufeng was "required to anticipate" at the case brief deadline "that Commerce would accept [a] certain argument[]" asserted in another party's case brief—let alone that that argument would be asserted at all.  Calgon Carbon Corp. v. United States, 40 CIT 55, 62, 145 F. Supp. 3d 1312, 1320 (2016); cf. also Gleason Indus. Prods., Inc. v. United States, 32 CIT 382, 389 n.6, 559 F. Supp. 2d 1364, 1370 n.6 (2008) ("Plaintiffs have had no reason to focus on these subarguments of their main argument, which was preserved, that HTS 8483.20.00

data should be used, and therefore, they are not found to have waived their right to have the court review their arguments.").

Boomerang Tube does not support the Government's argument on this point. Boomerang Tube, a U.S. petitioner, failed in that antidumping case to exhaust an argument that Commerce should have classified certain sales between a Saudi entity ("JESCO") and a Colombian distributor as intra-company transfers in calculating a profit element of constructed normal value ("CV"). See Boomerang Tube, 856 F.3d at 912. Boomerang Tube submitted a rebuttal brief in which it addressed the general issue of whether Commerce should use those sales as a basis for its profit calculation, but not the specific issue of whether the sales were transacted within a single company. Id. at 911. The Federal Circuit held that this non-exhaustion was not excusable because Boomerang Tube had ample notice, at the time of the non-exhaustion, that Commerce might use the sales to the Colombian distributor in its profit calculation:

> It is undisputed that the data regarding JESCO's transactions with the affiliated distributor were in the record prior to Commerce's preliminary determination. At that point, U.S. Steel and Boomerang either knew or should have known that Commerce may consider those data during its calculations, especially given that the basis of CV profit was at issue. It is also undisputed that, in its case brief, JESCO suggested using those data to calculate CV before Commerce. At that point, Boomerang and U.S. Steel had notice of the potential that Commerce might use the Colombian data to calculate JESCO's CV profit. Indeed, Boomerang's rebuttal brief to Commerce reveals that it recognized JESCO's suggestion to use the Colombian data for CV profit and that Boomerang objected to that approach.

Id. at 913. Boomerang Tube had reason to know, in other words, that (1) the record contained data related directly to the potential affiliation issue, that (2) Commerce was actively considering calculating constructed value on the basis of the Colombia transactions, that (3) adverse parties to the administrative proceeding had argued in their case briefs that Commerce should do just that, and that (4) those adverse parties had specifically argued that Commerce should use the affiliated

transaction–related data in calculating constructed value. See id. Despite all this, Boomerang Tube proceeded to file a rebuttal brief that did not address the affiliation issue.

Fufeng did not share these epistemic advantages at the analogous stage of this administrative review. As explained above, Fufeng did not even have a reason to know that Commerce's listing of "2701129000" in the Preliminary Surrogate Value Spreadsheet represented Commerce's intent to value Fufeng's own coal under that subheading in a hypothetical direct-valuation scenario. And even if Fufeng could have somehow perceived this, Fufeng would have still lacked timely notice that this hypothetical scenario might come to pass. While Boomerang Tube presumably could have exhausted its affiliation argument in its rebuttal brief, Fufeng's last opportunity to exhaust its HTS subheading classification argument turned out to be the case brief deadline—before any party to the administrative review had argued for direct valuation. See Rejection Letter; cf. Boomerang Tube, 856 F.3d at 913 (premising the non-excusability of Boomerang Tube's non-exhaustion on the "inclusion of the relevant data in the record and the advancement of arguments related to that data before Commerce" (emphasis added)).

Applying the ordinary exhaustion requirement here would effectively deprive Fufeng of a forum in which to argue against the assignment of HTS 2701.12.9000 to Fufeng's coal. The administrative forum in this case proved unavailable because, as outlined above, Fufeng had no reason to suspect that the argument would be relevant until after the regulatory case brief deadline that Commerce imposed. The additional unavailability of the judicial forum would close off Fufeng's path to relief altogether. Even "a strict view" of 28 U.S.C. § 2637(d)'s exhaustion provision, Corus Staal, 502 F.3d at 1379, cannot compel an outcome that would deprive a party of

"a full and fair opportunity to raise [an] issue." Qingdao Taifa, 33 CIT at 1093, 637 F. Supp. at 1236.

While under other circumstances the court might proceed to decide the merits of an unexhausted argument upon concluding that the discretionary exhaustion bar does not apply, see, e.g., Saha Thai Steel Pipe Co. v. United States, 17 CIT 727, 730, 828 F. Supp. 57, 60 (1993), special considerations favor a different course here. This is because the issue of Commerce's HTS subheading assignment to Fufeng's coal—as distinct from the threshold issue of whether Fufeng exhausted its argument—remains substantially undeveloped below and only half-briefed before the court. The Government addressed only the exhaustion aspect of Fufeng's argument in its response brief, see Gov't Br. at 19–28, even though Fufeng had discussed the merits of its argument at some length in its opening brief. See Pls.' Br. at 21–26. This means that the Government cannot prevail on the basis of its presentation. "It is well established that arguments that are not appropriately developed in a party's briefing may be deemed waived." United States v. Great Am. Ins. Co. of N.Y., 738 F.3d 1320, 1328 (Fed. Cir. 2013).

But the effect of the Government's waiver here is not the compulsion of a particular result on remand, which the court ordered in Calgon Carbon after "the parties advised that nothing was conceded and the court should decide the matter as it stood." 40 CIT at 63, 145 F. Supp. 3d at 1322. In this case the matter does not stand anywhere—Commerce did not offer an affirmative explanation for why it selected HTS 2701.12.9000 during the proceeding below, and appeared instead to rest its determination on its non-consideration of the arguments in Fufeng's rejected rebuttal brief. See generally Final Surrogate Value Mem.; Rejection Letter; Second Rejection Letter. Otherwise put, the court does not have enough before it to "ask itself" the question of

"whether substantial evidence on the record supports that the surrogate HTS heading is sufficiently product-specific to the [factor of production] at issue . . . ." Ancientree Cabinet, 45 CIT at __, 532 F. Supp. 3d at 1262 (internal quotation marks, alterations, and citation omitted).  This is instead a case where "legitimate, prudential concerns warrant[] both waiver of [Fufeng's] failure to exhaust its administrative remedies and a remand to Commerce for further consideration of the issue." ABB, Inc. v. United States, 920 F.3d 811, 818 (Fed. Cir. 2019).

The court accordingly remands this element of the Final Review for Commerce to determine in the first instance—upon consideration of Fufeng's agency- and USCIT-level filings—whether HTS 2701.12.9000 or HTS 2701.19 is the proper subheading for the valuation of Fufeng's coal factor of production.  Of course, if Commerce reverses course on remand after reconsidering the issue of direct valuation itself, see Section I, supra, no such determination will be necessary.

III.     *Fufeng Lacks Standing to Challenge Commerce's Differential Pricing Methodology.*

The court next turns to Fufeng's challenge to Commerce's application of its differential pricing methodology as a means of calculating Fufeng's weighted-average dumping margin. Fufeng lacks standing to assert this particular challenge,[11] and the Government's motion to dismiss in part is granted.

---

[11] Standing is a claim-by-claim inquiry.  As the U.S. Supreme Court explained in TransUnion LLC v. Ramirez, "standing is not dispensed in gross; rather, plaintiffs must demonstrate standing for each claim that they press . . . ."  594 U.S. 413, 431 (2021) (citations omitted); see also Dow Jones & Co. v. Ablaise Ltd., 606 F.3d 1338, 1348 (Fed. Cir. 2010) ("According to the U.S. Supreme Court: 'a plaintiff must demonstrate standing for each claim he seeks to press' and 'for each form of relief' that is sought." (quoting DaimlerChrysler Corp. v. Cuno, 547 U.S. 332, 352, (2006))); USCIT R. 12(b) (referring to "[e]very defense to a claim for relief in any pleading . . . .").

In the Preliminary Review, Commerce "found that a total of 88.4 percent of Fufeng's [Export Price] and [Constructed Export Price] sales pass the Cohen's *d* test" and stated that this "confirms the existence of a pattern of prices that differ significantly among purchasers, regions, or time periods." PDM at 17. But Commerce nevertheless used the standard A-A method rather than the A-T method to compare normal value to export price, explaining that "there is not a meaningful difference in the weighted-average dumping margins calculated using the A-A comparison method and the A-T comparison method." Id.[12]

In its case brief, Fufeng acknowledged that "the Department's preliminary choice of A-A instead of A-T comparison was compelled solely by the results of the meaningful difference test." Fufeng's Case Br. at 18. But even though this meant that the "passage" of the Cohen's *d* test was immaterial to Commerce's dumping margin calculation, Fufeng persisted in arguing that Commerce's application of the Cohen's *d* test to Fufeng's U.S. sales data was unlawful. Id. at 19. Fufeng stated that Commerce's application of the A-T method "could have" resulted in a higher calculated dumping margin, and framed its argument in hypothetical terms:

> In the event that other modifications of Fufeng's preliminary margin result in the Department concluding that a meaningful difference exists, and that Fufeng's margin should be calculated based on A-T rather than A-A, we believe that resort to A-T would be contrary to law, for the reasons discussed below.

Id.

Fufeng's fear that Commerce might reverse its meaningful-difference finding in the Final Review, and that such a reversal might render material the outcome of the Cohen's *d* test, proved

---

[12] Recall that Commerce uses the A-T method only if all three of the Cohen's *d*, ratio, and meaningful difference tests confirm that choice. See Differential Pricing Analysis, 79 Fed. Reg. at 26723.

unfounded. Commerce in the <u>Final Review</u> continued to find that under the meaningful difference test,

> there is no meaningful difference between the weighted-average dumping margin calculated using the A-to-A method and the weighted-average dumping margin calculated using an alternative comparison method based on applying the A-to-T method to those U.S. sales which passed the Cohen's *d* test and the A-to-A method to those sales which did not pass the Cohen's *d* test.

IDM at 34.[13] Commerce accordingly used the A-A method to calculate Fufeng's weighted-average dumping margin. <u>See</u> Final Calculation Mem. at 7. And because Commerce would have selected this method regardless of the result of the Cohen's *d* test, the lawfulness of that test's implementation did not affect Fufeng's dumping margin in either direction.

But now, even after successfully averting Commerce's calculation of a "higher margin" in the administrative review proceeding, Fufeng's Case Br. at 19, Fufeng will not let the matter drop. Fufeng represents to the court that "[w]hile the Final Results retained the A-A methodology simply because there was no 'meaningful difference' between the A-A and A-T margins, Commerce's differential pricing methodology as applied to Fufeng's U.S. sales is unlawful.'" Pls.' Br. at 38. This, Fufeng argues, is because "the <u>Final Results</u> are potentially flawed because Commerce failed to analyze, much less demonstrate, whether Fufeng's pricing data satisfy the conditions for the Cohen's *d* test to be considered valid." <u>Id.</u> at 43.

The Government responds that Fufeng lacks standing to bring this particular challenge and moves to dismiss the relevant count of Fufeng's Complaint pursuant to USCIT Rule 12(b)(1), which provides for a party's assertion of a defense on the basis of the court's "lack of subject

---

[13] The A-to-A method yielded a 17.36 percent dumping margin, and the A-to-T method yielded a 19.91 percent dumping margin. Final Calculation Mem. at 7.

matter jurisdiction." See Gov't Br. at 10; Compl. ¶ 28. The Government is correct, and its motion to dismiss is granted.

The three elements of the "'irreducible constitutional minimum' of standing" are that "[t]he plaintiff must have (1) suffered an injury in fact, (2) that is fairly traceable to the challenged conduct of the defendant, and (3) that is likely to be redressed by a favorable judicial decision." Spokeo, Inc. v. Robins, 578 U.S. 330, 338 (2016) (quoting Lujan v. Defenders of Wildlife, 504 U.S. 555, 560 (1992)). "To establish injury in fact, a plaintiff must show that he or she suffered 'an invasion of a legally protected interest' that is 'concrete and particularized' and 'actual or imminent, not conjectural or hypothetical.'" Id. at 339 (quoting Lujan, 504 U.S. at 560). "[T]he burden of showing that an error is harmful normally falls upon the party attacking the agency's determination." Shinseki v. Sanders, 556 U.S. 396, 409 (2009). And "[i]n the antidumping context," this means that "a party challenging a purported error by Commerce must show that it was harmed as a result of the error." SolarWorld Ams., Inc. v. United States, 962 F.3d 1351, 1359 (Fed. Cir. 2020).

Fufeng has not made this showing here. Even if Commerce erred in applying the Cohen's *d* test, Fufeng does not establish how that error would constitute an injury in fact, let alone one that would "likely to be redressed by a favorable judicial decision." Spokeo, 578 U.S. at 338. This is because the precise administrative outcome that Fufeng seeks—Commerce's application of the A-A method as opposed to the A-T method—has already occurred. Even if Fufeng as a commercial entity has an interest in how Commerce conducts its Cohen's *d* analysis in future investigations and reviews, that interest lacks any material connection to the particular administrative review that is the subject of this case.

The circumstances of this case almost precisely mirror those of <u>Best Mattresses Int'l Co. v. United States</u>, another antidumping duty–related case. 47 CIT __, 622 F. Supp. 3d 1347 (2023). In the administrative proceeding underlying <u>Best Mattresses</u>, Commerce's Cohen's *d* test yielded a finding of a pattern of significant price disparities among a respondent's U.S. sales. <u>Id.</u> at 1367. But upon finding no meaningful difference between the dumping margins that would result (respectively) from the A-A and A-T methods, Commerce used the A-A method to calculate a marginally smaller dumping margin. <u>Id.</u> In subsequent litigation before this court, the plaintiffs argued against the hypothetical application of the A-T method on the ground that Commerce's finding of a pattern of significant price disparities through the Cohen's *d* test was not supported by substantial evidence. <u>Id.</u> The Government moved under USCIT Rule 12(b)(1) to dismiss the relevant count of the plaintiffs' complaint for lack of standing, and the court granted that motion:

> Because Commerce ultimately applied the method of calculation that Plaintiffs requested, and Commerce's use of the Cohen's *d* test is not dispositive to the final dumping margin, the alleged harm of a potentially misapplied Cohen's *d* test amounts to a "bare procedural violation" and does not "entail a degree of risk sufficient to meet the concreteness requirement."

<u>Id.</u> (quoting <u>Spokeo, Inc. v. Robins</u>, 578 U.S. 330, 337 (2016)).

The issue the court confronted in <u>Best Mattresses</u> does not differ from the issue at hand in any material respect. Fufeng, recognizing this similarity, states that it "respectfully disagrees with the contrary result ordered by this Court in [<u>Best Mattresses</u>], and asks this Court to reconsider . . . the analysis which led to its decision in that case." Pls.' Reply at 16 n.1. But Fufeng offers no compelling reason why the court should depart from <u>Best Mattresses</u>. The main argument for standing that Fufeng advances in its reply—that "[c]ontinued application of the Cohen's *d* test upon remand could require additional rounds of briefing regarding an inflated [antidumping duty] rate and would waste the resources of the Court and all parties to this proceeding," Pls.' Reply at

16—was squarely addressed in Best Mattresses itself. The court explained in that case that "prudential concerns about repetitive briefing at a later stage cannot justify an extension of judicial power beyond Article III's mandatory limits," and cautioned that "if the court were to rule for Plaintiffs now, and if the Cohen's *d* test is once again immaterial to the final dumping margin on remand, then the court will have opined on a hypothetical legal matter outside the live controversy of this case." Best Mattresses, 47 CIT at __, 622 F. Supp. 3d at 1369 (citing NLRB v. Globe Sec. Servs., Inc., 548 F.2d 1115, 1118 (3d Cir. 1977)). To this line of reasoning, Fufeng offers only the most basic expression of disagreement. The court is unpersuaded.

For these reasons, the Government's motion to dismiss Count Six of Fufeng's Complaint for lack of standing pursuant to USCIT Rule 12(b)(1) is granted.

### IV. *Commerce Lawfully Deducted Section 301 Duties from its Calculation of Fufeng's Export Price.*

Fufeng also challenges Commerce's reduction of Fufeng's export price by the amount of a separate Section 301 duty imposed on Fufeng's imports of subject xanthan gum. See Compl. ¶ 26. Commerce deducted the amount in question under 19 U.S.C. § 1677a(c)(2)(A), which provides that a respondent's export price "shall be reduced by the amount, if any, included in such price, attributable to any . . . United States import duties . . . ." See IDM at 31–32.

Whether this deduction is in accordance with law turns on whether this particular Section 301 duty is a "United States import dut[y]" covered by 19 U.S.C. § 1677a(c)(2)(A). The court concludes that the answer is yes, and accordingly denies this element of Fufeng's motion for judgment on the agency record.

First, some background. On August 18, 2017, the President initiated a Section 301 investigation by directing the USTR to "determine . . . whether to investigate any of China's laws,

policies, practices, or actions that may be unreasonable or discriminatory and that may be harming American intellectual property rights, innovation, or technology development." Addressing China's Laws, Policies, Practices, and Actions Related to Intellectual Property, Innovation, and Technology, 82 Fed. Reg. 39007, 39007 (Exec. Off. of the President Aug. 17, 2017); see also 19 U.S.C. §§ 2411—2412. After a year-long investigation, the USTR imposed Section 301 duties on a number of goods imported from China. See Notice of Determination and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301, 83 Fed. Reg. 14906, 14906 (U.S. Trade Rep. Apr. 6, 2018) ("Notice of Determination"); Notice of Action and Request for Public Comment Concerning Proposed Determination of Action Pursuant to Section 301, 83 Fed. Reg. 28710, 28711–12 (U.S. Trade Rep. June 20, 2018) ("Notice of Action"); Notice of Action Pursuant to Section 301, 83 Fed. Reg. 40823, 40824 (U.S. Trade Rep. Aug. 16, 2018). The USTR then extended the scope of these duties—which until then applied to products classified under two lists of HTS subheadings—to a third list of subheadings that includes HTS 3913.90.20 ("Polysaccharides and their derivatives, nesoi,[14] in primary forms"). See Notice of Modification of Section 301 Action: China's Acts, Policies, and Practices Related to Technology Transfer, Intellectual Property, and Innovation, 83 Fed. Reg. 47974, 48076 (U.S. Trade Rep. Sept. 21, 2018) ("Notice of Modification"). As the subject xanthan gum is classified under this subheading, these Section 301 duties (the "List 3 Duties") applied to Fufeng's imports of subject xanthan gum during the period of review. See IDM at 3, 32.

---

[14] "Nesoi" is an acronym for "not elsewhere specified or included." The Year in Trade 2018, Operation of the Trade Agreements Program, 70th Rep. at 12, USITC Pub. 4986 (Oct. 2019).

In the Final Review Commerce deducted the List 3 Duties from its calculation of Fufeng's

export price in accordance with 19 U.S.C. § 1677a(c)(2)(A), an act that increased Fufeng's final

dumping margin. IDM at 31. Commerce determined that Section 301 duties as a general category

are deductible from export price, and explained its reasoning for the deduction as follows:

> Section 301 duties are imposed to address a variety of unfair trading acts, policies, and practices of U.S. trading partners. As explained in [Wheatland Tube Co. v. United States, 495 F.3d 1355, 1362 (Fed. Cir. 2007)], special duties are intended to provide remedial relie[f] from the adverse effects of imports, while normal U.S. customs duties are imposed regardless of whether a U.S. industry is suffering from such adverse effects and, instead, address broad national concerns. For example, section 301 duties are imposed to address three broad categories of acts, policies, or practices of a foreign country that may include: (i) trade agreement violations; (ii) acts, policies or practices that are unjustifiable (defined as those that are inconsistent with U.S. international legal rights) and that burden or restrict U.S. Commerce; and (iii) acts, policies or practices that are unreasonable or discriminatory and that burden or restrict U.S. Commerce. Therefore, harm from imports is not a [prerequisite] for the imposition of section 301 duties. On the contrary, special duties, such as antidumping, countervailing, and section 201 duties, are imposed to address the specific threat of injury or actual injury to a domestic industry as a result of imported merchandise. Thus, section 301 duties are distinguished from special duties and meet the definition of normal U.S. import duties under section 772(c)(2)(A) of the Act.

Id. at 31–32.

Fufeng, seemingly adopting Commerce's implied premise that the deductibility of the List

3 Duties depends on whether Section 301 duties are categorically deductible, argues in its brief

before the court that Section 301 duties are categorically non-deductible under what it

characterizes as the Federal Circuit's holding in Wheatland Tube. See Pls.' Br. at 30–37. In

Fufeng's view, Section 301 duties belong (alongside antidumping and countervailing duties) to

the category of non-deductible "special duties" that "are imposed to remedy the harm arising from

unfairly traded goods." Id. at 31.

In assessing the merits of Fufeng's challenge, the court need not decide whether Section 301 duties—as an entire category—are inherently non-deductible "special duties" under Wheatland Tube or any other authority. This is because under Borusan, which the Federal Circuit decided after Commerce issued its IDM in this case, the court instead looks to "the authorized governmental action that actually prescribed the duty on imports at issue." 63 F.4th at 34; see also Jinko Solar Imp. & Exp. Co. v. United States, 48 CIT __, __, 701 F. Supp. 3d 1367, 1392 (2024) ("Borusan . . . rejects such statute-wide distinctions. Rather, it is the text of the order imposing the duty that controls.").

Fufeng disputes Borusan's applicability to this case, pointing out that it involved the deductibility under 19 U.S.C. § 1677a(c)(2)(A) of duties imposed via presidential proclamation pursuant to the distinct Section 232 of the Trade Expansion Act of 1962, Pub. L. No. 87-794, 76 Stat. 872, 877 (codified as amended at 19 U.S.C. § 1862). See Pls.' Br. at 32; Pls.' OAQ Resp. at 4–5. Fufeng seizes on this distinction, arguing that Borusan's rationale is limited to "the context of Section 232 duties, having a materially different purpose of safeguarding national security instead of providing trade remedies." Pls.' Br. at 33.

But the Federal Circuit's opinion in Borusan suggests a much wider sweep than that.[15] The Federal Circuit explained its implementing instrument–specific approach by stating that

---

[15] The court confronted this precise scenario—involving the exact Section 301 duties, imposed on a product on List 2—one year ago in Shanghai Tainai Bearing Co. v. United States, 47 CIT __, 658 F. Supp. 3d 1269, 1294 (2023). The court reached the same conclusions as it does here regarding both Borusan's applicability and the deductibility of the Section 301 duty at issue. The court took up the issue again eight months later in Jinko Solar, and there too applied Borusan's rationale in concluding that a Section 301 duty was deductible from export price. See 48 CIT at __, 701 F. Supp. 3d at 1392 ("Although Jinko contends that Borusan involved Section 232 duties concerning national security, Borusan rejects such statute-wide distinctions. Rather, it is the text

"[n]othing in § 1677a(c)(2)(A) requires the uniform treatment of all duties prescribed under a particular statutory authorization," and that "[n]or, more specifically, have we been shown anything in the § 232 framework that requires the uniform treatment of all duties imposed by the President under § 232." Id. at 33–34.

The court in this case follows the Federal Circuit's holding as to the general requirements of § 1677a(c)(2)(A), a holding that is independent of Section 232's particular features. And as for the Federal Circuit's holding regarding "the § 232 framework," id. at 33, the court observes that the text of Section 301—just like that of Section 232—does not compel a uniform conclusion regarding the deductibility of all duties imposed under it. Section 301 contemplates a broad range of possible remedies, see 19 U.S.C. § 2411(c)(1), to an equally broad range of possible harms. See id. § 2411(d)(2)–(5). Also like Section 232, it is not a duty-creating instrument in itself but a "statute [that] merely authorizes a governmental officer or body to impose a duty." Borusan, 63 F.4th at 33. Borusan is accordingly on point, meaning that for duties imposed under Section 301 "it is the particular exercise of the authority that determines—based on the character of that exercise—whether the prescribed duty comes within § 1677a(c)(2)(A)." Id.[16]

The court now turns to whether the USTR's specific exercise of authority under Section 301 to implement the List 3 Duties supports Commerce's deduction of those duties from its

---

of the order imposing the duty that controls. Here, the text of the notice of determination pursuant to Section 301 indicates that the Section 301 duties imposed are to be in addition to normal duties." (cleaned up)).

[16] As a result, the court construes Commerce's explanation in the IDM as supporting only the deductibility under § 1677a(c)(2)(A) of the particular List 3 Duties at issue. The court's holding in this case does not necessarily preclude a future determination that some other action undertaken pursuant to Section 301 might qualify as a non-deductible duty.

calculation of Fufeng's export price. Here, too, the Federal Circuit's holding in Borusan (in the Section 232 context) is instructive.

The President implemented the Section 232 duty at issue in Borusan by issuing a proclamation whose language "[made] clear that the duty newly being imposed was to add to, and not partly or wholly offset, the antidumping duties that would be due without the new duty." Borusan, 63 F.4th at 34 (citing Proclamation No. 9705, 83 Fed. Reg. 11625 (Mar. 8, 2018) ("Proclamation 9705")). Because that proclamation stated that the Section 232 duty was to be imposed "in addition to any other duties," the Federal Circuit "conclude[d] that the only fair reading of Proclamation 9705 is that, when applied to an article covered by antidumping duties, the Proclamation 9705 and antidumping duties must together result in a full imposition of both duties." Id. at 34–35. Otherwise, the Federal Circuit reasoned, "the Proclamation 9705 duty would be offset substantially or completely by a reduction in the antidumping duty itself." Id. at 35. The Federal Circuit then distinguished Proclamation 9705 from the implementing presidential proclamation at issue in Wheatland Tube, 495 F.3d 1355, which unlike Proclamation 9705 lacked language "requir[ing] that its duty be treated as a United States import duty to be subtracted under § 1677a(c)(2)(A)." Borusan, 63 F.4th at 36 (internal quotation marks and alterations omitted). While the Federal Circuit also noted Commerce's "background recognition" in the Wheatland Tube proceeding "concerning potential overlap of § 201 duties and antidumping duties," it ultimately concluded that "[i]n the present matter, as in the earlier [Wheatland Tube] one, the duty's treatment under § 1677a(c)(2)(A) is effectively determined by the President in exercising the broad power to shape the particular duty imposition." Id.

The court now applies this analysis to the USTR's "duty-creating action" (or, more precisely, actions) in this case. These are the April 6, 2018 Notice of Determination, through which the USTR proposed the Section 301 duties, the August 16, 2018 Notice of Action, through which it enacted them, and the September 21, 2018 Notice of Modification, through which it extended the duties to cover the products enumerated in List 3. The Notice of Determination states, much like Proclamation 9705 in Borusan, that "the proposed action is an additional duty of 25 percent on a list of products of Chinese origin." 83 Fed. Reg. at 14907 (emphasis added). The Notice of Determination further states that:

> if a good of Chinese origin is currently subject to a zero ad valorem rate of duty, the product would be subject to a 25 percent ad valorem rate of duty; if a good of Chinese origin were currently subject to a 10 percent ad valorem rate of duty, the product would be subject to a 35 percent ad valorem rate of duty, and so on.

Id.; see also Notice of Modification, 83 Fed. Reg. at 47974–75 (referring repeatedly to an "additional duty" and stating that the modification is "in accordance with the specific direction of the President").

The Notice of Action lends yet sturdier support to Commerce's determination that the List 3 Duty on xanthan gum is deductible from Fufeng's export price. In addition to restating that the Section 301 duty is an "additional duty," it goes on to specify that "the rates of duty . . . apply in addition to all other applicable duties, fees, exactions, and charges." Notice of Action, 83 Fed. Reg. at 40824 (emphasis added). This language almost exactly tracks that of Proclamation 9705, which "directed that the [Section 232] duty was to be imposed 'in addition to any other duties, fees, exactions, and charges applicable to such imported steel articles.'" Borusan, 63 F.4th at 29 (quoting Proclamation 9705, 83 Fed. Reg. at 11627).

Taken together, these explanations for executive action leave little doubt that the List 3 Duty on xanthan gum is a remedy that supplements, rather than substitutes, any antidumping duties that Commerce imposes pursuant to 19 U.S.C. § 1673.

A case may one day arise that will require the court to assess the Congressional policies expressed in Section 301, and to issue a categorical holding as to some general feature of all duties imposed thereunder. But that is not this case. Here, it is necessary to observe only that Commerce's deduction of the List 3 Duty is in accordance with law, where the "law" comprises a series of authoritative statements by the President and the Executive Office about the character of the specific action at issue. See 19 U.S.C. § 1516a(b)(1)(B).

This element of Commerce's Final Review is accordingly sustained.

## CONCLUSION

For the foregoing reasons, it is hereby:

**ORDERED** that Count Six of Plaintiffs' Complaint, Apr. 17, 2024, ECF No. 13, is **DISMISSED**; and it is further

**ORDERED** that the U.S. Department of Commerce's determination in Xanthan Gum from the People's Republic of China: Final Results of Antidumping Duty Administrative Review and Final Determination of No Shipments; 2020-2021, 88 Fed. Reg. 9861 (Dep't Com. Feb. 15, 2023), is **REMANDED** for further proceedings consistent with this opinion, and it is further

**ORDERED** that the U.S. Department of Commerce is instructed to reconsider the antidumping duty rate applied to Consolidated Plaintiffs Meihua Group International (Hong Kong) Limited, and Xinjiang Meihua Amino Acid Co., Ltd., based on any changes to the margin calculated for Plaintiffs, and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within ninety days of the date of this opinion. The timeline for filings and comments regarding the second remand redetermination shall proceed according to USCIT Rule 56.2(h).

**SO ORDERED.**

/s/      *Gary S. Katzmann*
Gary S. Katzmann, Judge

Dated: December 16, 2024
         New York, New York